Daisey L. CUNNINGHAM and Beatrice I. Cunningham, owners of Tract No. 10, and W. A. Worth and wife, Ethel E. Worth, and Oregon Inlet, Inc., owners of Tract No. 12, Appellants,

v.

UNITED STATES of America, Appellee.

No. 7817.

United States Court of Appeals Fourth Circuit.

Argued April 9, 1959.

Decided Sept. 26, 1959.

**546**

L. P. McLendon, Sr., and Hubert Humphrey, Greensboro, N. C. (McLendon, Brim, Holderness & Brooks, Greensboro, N. C., on the brief), for appellants.

Roger P. Marquis, Atty., Dept. of Justice, Washington, D. C. (Perry W. Morton, Asst. Atty. Gen., Julian T. Gaskill, U. S. Atty., Goldsboro, N. C., and Clyde E. Gooch, Asst. U. S. Atty., Salisbury, N. C., on the brief), for appellee.

Before SOBELOFF, Chief Judge, HAYNSWORTH, Circuit Judge, and BOREMAN, District Judge.

HAYNSWORTH, Circuit Judge.

The present question in this much litigated condemnation case is whether the District Court properly rejected the supplemental report and award of the commission and substituted its own findings and conclusions.

The land involved is the southern portion of Bodie Island, North Carolina. It contains approximately 1,858 acres bounded on the east by the Atlantic Ocean, on the west by Pamlico and Roanoke Sounds, on the south by Oregon Inlet and on the north by other lands of the United States. Still farther north, but still on Bodie Island, are Nags Head, Kill Devil Hills and Kitty Hawk. The condemned land has approximately four miles of ocean frontage and it is roughly one mile wide measured from ocean to sound.

The land had been improved in 1951 by the construction of a state highway running through it from north to south approximately 1,200 feet inland from the ocean. The highway terminates near the southern end of the property at a ferry slip from which free ferries operate to Hatteras Island. The highway gives access to the land from Nags Head and other resort areas to the north.

After the highway was completed, electric power and telephone lines were run through the property.

The land was largely undeveloped. There was an artificial duck pond, a 12-room residence and other buildings useful to a hunting club. Near the inlet was a boat basin, with docks, an ice house and other facilities for servicing commercial and sport fishing vessels and pleasure craft. With the new accessibility provided by the highway, and the availability of electric power and telephones, development of the ocean frontage for residential purposes became practical. The District Court and the commission each attributed the greatest value to that portion of the ocean frontage which is sufficiently high for residential use.

In 1948, the owner platted a residential subdivision of 5,000 feet of his ocean frontage. This was divided into 100 lots, each fronting 50 feet on the ocean, extending back to the road and containing approximately one acre. He sold seven of these lots. He explained his failure to sell more by his wish to hold them for the higher prices he anticipated after completion of the highway and the fact that soon after the highway was completed it became known that the land was to be condemned.

Two of the seven lots sold are also involved in this proceeding. They are re-

ferred to as tract 10. The remainder of the land is referred to as tract 12.

After deciding that the United States could lawfully condemn the land for use as a part of the Cape Hatteras National Seashore Recreation Area,[1] the District Court appointed a commission to determine just compensation. As commissioners, he appointed an attorney and two experienced real estate men in whom he had great confidence.

The commissioners held extended hearings in nearby Manteo and in Raleigh. They went over the land on foot and in motor vehicles. They inspected it from the water by boat and from the air by helicopter. They then filed a brief report in which they found just compensation for tract 10, the two lots, to be $4,000 and for tract 12, the remainder of the land, $484,000.

The report contained no findings of basic facts and no statement of the considerations which led the commissioners to their conclusion. The District Court reviewed all of the evidence, made certain findings and confirmed the award.[2] We reversed.[3] Though the District Court had supplied the findings we thought essential to the validity of the award, he had accepted the commission's valuation rather than making an independent valuation based upon his appraisal of the testimony and his knowledge of the land. We directed that the case be resubmitted to the commission in order that it might make basic findings and supply a statement of the legal principles it applied.

In resubmitting the case the District Court gave the commission detailed and specific instructions. At the request of the United States, he informed the commissioners that they were not bound by their previous valuation, but were free to find just compensation to be more or less than their earlier conclusion.

In due time the commissioners reported that in order to find the highest and best use they had divided tract 12 into four subtracts:

Tract A—the upper portion of the ocean frontage. They found that 345 acres between the ocean and the highway, bounded on the north by the property line, were suitable for residential development. They found that this tract was high enough for the purpose and no more susceptible to tidal overflow and storm damage than other areas previously developed on the island.

Tract B—the lower portion of the ocean frontage. They found that 182 acres, south of tract A were too low for residential development. Its highest and best use they found to be for recreational purposes, sport fishing and other water and beach activities.

Tract C—the boat yard. They found that a tract of approximately ten acres around the boat basin, upon which were located the facilities for servicing boats, was presently put to its highest and best use.

Tract D—the remainder of tract 12. The commissioners found that the 1,321 acres lying between the highway and Roanoke Sound were best used for the purposes of a hunting and fishing club. They found this tract had some potential for beach development and small commercial facilities. Most of this tract is quite low, but, with its artificial lake, it provided breeding and feeding grounds for wild fowl and game. With its large residence and other facilities, it already had been developed as a hunting club.

The commissioners found that the subtracts were complementary. The varied opportunity for sport and recreation offered by tracts B, C and D would tend to enhance the value of tract A, and the potential of tract A for residential de-

1. United States v. Southerly Portion of Bodie Island, D.C.E.D.N.C., 114 F.Supp. 427.

2. See United States v. Southerly Portion of Bodie Island, D.C.E.D.N.C., 19 F.R.D. 313.

3. United States v. Cunningham, 4 Cir., 246 F.2d 330.

velopment would tend to enhance the value of the other areas.

The report contains many other specific findings of fact, statements of their use of many evidentiary facts and statements of the legal principles they applied. It concludes with a determination of just compensation, $4,000 for tract 10 and $484,000 for tract 12.

The resident judge having become ill, the report was brought before another District Judge for his consideration. He concluded that the report did not meet the requirements of the mandate of this court. He, therefore, set it aside, made his own findings upon his review of the record and reduced the award to $3,000 for tract 10 and $343,000 for tract 12.[4]

We think he should have accepted and confirmed the report and award of the commissioners.

■ The failure of the commissioners to find a value for each of the subtracts of tract 12 is the first ground of attack upon the report. It may be that, under the circumstances of this case, we would not find fault with a report which separately valued each use area and found just compensation to be the sum of the separate values. See United States v. City of New York, 2 Cir., 165 F.2d 526, 1 A.L.R.2d 870. In the earlier appeal, however, we admonished the commissioners:

> " * * * This testimony (of values of portions of the land for special purposes) was admissible as bearing on the question of valuation, even though it was required that the property be valued as a whole. Cade v. United States, 4 Cir., 213 F.2d 138. It would not be proper, however, to attempt to arrive at value by adding these elements of value together. Morton Butler Timber Co. v. United States, 6 Cir., 91 F.2d 884; United States v. Certain Parcels of Land, 5 Cir., 149 F.2d 81. * * * " [246 F.2d 333]

It is true we were then thinking, in part, of testimony that the land contained ilmenite and had a value for mining purposes, a use inconsistent with other claimed uses. We can hardly say the commissioners failed to follow our instructions, however, when they did what they were told to do by this Court and by the District Court. In resubmitting the case, the District Court instructed the commissioners to find a single value for tract 12 as a whole.

No one requested the courts to instruct the commissioners to find separate values for the subtracts until the landowners did so after the completed report had been considered by the District Court. No one requested the commissioners to find such values. Furthermore, the absence of separate valuations is no undue hindrance to judicial review, for, as will presently appear, the reason for the differences between the findings of the commissioners and those of the District Judge is clear.

The District Judge thought the commission plainly wrong in finding that 345 acres (tract A) could be developed economically for residential use. He found that only 193 lots, approximately 193 acres, could be so developed and these would require expensive filling to increase their elevation. In reaching the conclusion he did, he relied, in part, upon testimony which is equivocal in the record.

Necessarily, the commission drew the boundaries of the subtracts only after the witnesses had testified. Frequently lacking outstanding topographical features to use as reference points, witnesses identified areas about which they testified by pointing to their locations upon a map. The commissioners could see and understand the identification, but the reader of the transcript is left in some confusion. In many instances, the context suggests that witnesses testifying that land was too low for subdivision or would require extensive filling were referring to areas which the commission

---

4. See United States v. Cunningham, D.C., 166 F.Supp. 76.

incorporated in tracts B or D. In one instance, testimony which the District Judge thought applicable to tract A must have referred to an area in tract D; it was first identified as being east of the highway, but internal references to topography and a later explanation of the witness show that he was describing a lowlying area in tract D.

■■ This is not to say that there were no conflicts in the evidence. Some witnesses thought no more than 100 acres were really suitable for subdivision. The testimony of others supports the commission's finding. If the dubious references are eliminated, the preponderance of the testimony supports the finding of the commissioners. They heard and saw the witnesses. What may be uncertain to us from a reading of the transcript was plain to them. They also closely examined the land themselves and compared tract A with other developed areas on the island. Under these circumstances, Rule 53(e)(2) of the Federal Rules of Civil Procedure, made applicable here by Rule 71A(h), 28 U.S.C.A., requires acceptance of the finding of the commission.

The District Court, finding demand for the facilities of the boat yard on the increase, felt that 25 acres of surrounding land should have been allotted to tract C. He valued those 25 acres with their improvements at $85,000. The 193 acres, approximately, of tract A, which he found suitable for subdivision, he valued at $1,000 an acre, while the remainder of tracts A, B and D he valued at $65,000, or less than $40 an acre. Had the District Court accepted the commission's finding that 345 acres were suitable for subdivision, using his values, he would have arrived at a total valuation for tract 12 of $495,000 less the value he did assign to the portion of tract A he thought unsuitable for subdivision.[5] Deducting something for those acres on the basis of the average value he used would reduce

our projection of his award to $488,920 for tract 12. This compares with the $484,000, which the commission awarded and reveals the only real difference between the commission and the District Judge as their view of the evidence of the amount of land which could be subdivided.

We think the commission's finding that 345 acres were suitable for subdivision should have been accepted.

Whether tract 10, the two lots, should be valued at $4,000, as found by the commission, or at $3,000, as found by the District Court, is a matter of judgment. After concluding that the commission's report could not be accepted, the District Court made an independent finding which is supported by the testimony. There is also testimony to support the commission's valuation, and since we conclude their report was not fatally defective, their valuation must be accepted.

There was testimony about the sales value of individual lots, which the United States complains may have been misused by the commission. The report discloses its use, however, and a proper regard for the rule which prohibits valuation of land not yet effectively subdivided as if it had been. The amount of the award supports the commission's statement of its approach.

Evidence was introduced that in 1949 the Chief of Army Engineers recommended dredging the channels through Oregon Inlet and from that inlet to Manteo to increase the minimum depth from six feet to twelve feet. Congress approved the project in 1950.[6] No funds had been appropriated for the purpose, however, and no work had been done.

The commission found that the prospect of this channel improvement added something to the value of the boat yard. The yard was already patronized by smaller commercial fishing vessels, and deepening the channel would permit ves-

---

5. 152 acres at $40 an acre (the average value he assigned to tracts B and D and 152 acres of tract A) would be worth $6,080.

6. Act of May 17, 1950, 64 Stat. 163, 164.

sels of greater draft to work the nearby waters from Oregon Inlet, avoiding long runs to other ports.

■ The general rule that government need not compensate a landowner for values it creates by establishment of the project which results in the taking is not to be carried to extremes. The Supreme Court has suggested that it is to be limited to the land in the probable scope of the original project and to values created by that project which occasions the taking. United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336. The court in Iriarte v. United States, 1 Cir., 157 F.2d 105, 167 A.L.R. 494, pointed out the wide effect of governmental policies upon the values of real estate. Beyond the limits indicated by the Miller case, those effects upon value cannot be eliminated in determining just compensation. The value of much waterfront property is dependent upon governmental maintenance of channels and harbor improvements. Where the burden of such maintenance has been undertaken by government, private transactions reflect the enhanced value of waterfront property. If government later condemns the property, just compensation should not be less than private purchasers would pay.

■ We agree with the court in Iriarte that the only question here is whether there was such a reasonable prospect of the improvement in the foreseeable future as to affect sales value in private transactions or only a hope that would have no recognizable value in commerce. In Iriarte, the harbor improvement had not been authorized by the Congress. The Chief of Army Engineers had not recommended it. The owner had no more than a speculative hope that federal aid might be forthcoming in an uncertain future. Here the project had been authorized by Congress. No funds had been allocated to the project, but the authorization created a substantial prospect of accomplishment of the improvement. Private individuals would not immediately negotiate on the assumption the work was done, but they would not ig-

nore the Congressional authorization in their dealings.

As the District Court found, demand for the services of the boat yard was increasing. The Congressional authorization gave more than a vague hope of further increases to come. We think the commission properly considered the prospective harbor improvement as a relevant fact in the valuation process.

The United States finds fault with a number of subordinate findings of the commission. We have considered them all. We find them supported by the record and the commission's treatment of evidentiary facts proper and reasonable.

The judgment of the District Court will be reversed and the case remanded with directions to accept and confirm the report and award of the commission.

Reversed and remanded.