**ASSATEAGUE ISLAND CONDEMNA-
TION CASES OPINION NO. 5.**

**UNITED STATES of America**

**v.**

**CERTAIN LAND Situate IN the COUN-
TY OF WORCESTER, STATE OF
MARYLAND, and Ocean Beach, Inc., a
Maryland corporation, et al.**

**UNITED STATES of America**

**v.**

**128.25 ACRES OF LAND, Situate IN the
COUNTY OF WORCESTER, STATE
OF MARYLAND, and Otto M. Matirko,
et al.**

**Civ. Nos. 20667–T, 72–8–T.**

United States District Court,
D. Maryland.

Feb. 21, 1973.

Stanley J. Fineman and Philip M. Zeidner, Attys., Lands Div. Dept. of Justice, Washington, D. C., and George Beall, U. S. Atty., Baltimore, Md., for the United States.

Robert B. Barnhouse and Piper & Marbury, Baltimore, Md., for Robert S. Clements et ux.

THOMSEN, District Judge.

The case dealt with in this opinion is different from all the others which have gone to trial in these proceedings, in that it involves:

(1) A lot improved by one of the few dwellings on Assateague Island north of the Virginia line and south of the State park;[1]

(2) A 29.44 acre tract,[2] of which a part is under water, a part is subject to

---

1. Tract 8–573, sometimes referred to as Parcel 1.

2. Together, Tract 8–612, Parcels 2 and 3.

the ebb and flow of the tides, and a part is fast land, improved by a boathouse;[3] and

(3) An agreement entered into under 16 U.S.C. 459f–1(d),[4] the Assateague Island National Seashore condemnation statute, under which the owners of the two tracts, Clements et ux., may occupy for 25 years: (a) Parcel 1, the dwelling and the .46 acre lot on which it is built "for non-commercial residential purposes", (b) Parcel 2, the boathouse and an irregular 2.54 acre tract surrounding it for use in connection with the house on Parcel 1, but not as a separate residence, and (c) Parcel 3, the rest of the 29.44 acre tract, which may be used for hunting purposes during hunting seasons, all subject to the terms and conditions of the agreement, set out in note[5] in the margin.

3. The deed by which Clements received title to this tract stated that it contained 30.3 acres of land, more or less, but Clements does not dispute the testimony of Adelberg, the Government's surveyor, that the figure should be 29.44 acres.

4. § 2(d) of Pub.L. 89–195, Sept. 21, 1965, 79 Stat. 824, 825, which provides:

"Owners of improved property acquired by the Secretary may reserve for themselves and their successors or assigns a right of use and occupancy of the improved property for noncommercial residential purposes or for hunting purposes, as hereinafter provided, for a term that is not more than twenty-five years. In such cases, the Secretary shall pay to the owner of the property the fair market value thereof less the fair market value of the right retained by such owner: *Provided,* That such use and occupancy shall be subject to general rules and regulations established by the Secretary with respect to the outward appearance of any buildings on the lands involved. The term 'improved property' as used in this Act shall mean (1) any single-family residence the construction of which was begun before January 1, 1964, and such amount of land, not in excess of three acres, on which the building is situated as the Secretary considers reasonably necessary to the noncommercial residential use of the building, and (2) any property fronting on the Chincoteague Bay or Sinepuxent Bay, including the offshore bay islands adjacent thereto, that is used chiefly for hunting and continues in such use: *Provided,* That the Secretary may exclude from improved properties any marsh, beach, or waters, together with so much of the land adjoining such marsh, beach, or waters as he deems necessary for public use or public access thereto."

5. The agreement, finally executed on January 23, 1973, began by reciting, inter alia, that "it is the intention of the GOVERNMENT to provide for the preservation, development, and administration of Assateague Island for the use, benefit, and enjoyment of the people and public use for outdoor recreation", and that this property [which the court construes to mean Parcel 3, as well as the rest of the Island] "will be immediately used to provide: (a) access to adjacent public hunting zones; (b) access to adjacent public waters for fishing and shellfishing; (c) nature observation, bird watching, and photography; and (d) other nonconsumptive uses by visitors not inconsistent with the rights retained by DEFENDANTS".

The agreement then provided that Clements et ux.—

" * * * their successors and assigns shall have for a period of twenty-five (25) years the following rights * * *:

"(1) Exclusive use and occupancy of Tract 8–573, consisting of 0.46 of an acre, * * * Parcel 1, * * * for noncommercial residential purposes, together with the exclusive use and occupancy of that portion of Tract 8–612, * * * Parcel 2, consisting of 2.54 acres, more or less, including boathouse; provided, however, that no more than one residence may be maintained on the total 3.00 acres retained for residential purposes;

"(2) Exclusive use of the remainder of Tract 8–612, depicted * * * as Parcel 3, for hunting purposes during the annual designated season applicable under State or local law to this property, with the understanding that said remainder of Tract 8–612 shall be available for public use annually during the nonhunting season; provided, that DEFENDANTS, their successors and assigns shall have exclusive use of said remainder of Tract 8–612, commencing 45 calendar days prior to the opening date of any annual designated hunting season, as indicated above, for the sole purpose of preparing the property for hunting use, and continuing to the end of any annual designated hunting sea-

Parcel 1 (Tract 8–573) is a .46 acre residential lot in Section 2 of the platted subdivision known as South Ocean Beach, east of Baltimore Boulevard and west of the alley behind the ocean front lots, and some 500 ft. north of the Virginia line, shown and cross-hatched on Exhibit A attached to this opinion.

It is improved by a modern split-level dwelling, on pilings, with a ground level garage. The one story section of the house was constructed in 1953, and withstood the 1962 storm; [6] the two-story section was begun in 1968, and various improvements and appliances were added through 1972. It has been well maintained and is in good condition. There are a number of sand fences on the lot, which have aided in raising the average elevation to 7.1 ft. The dunes between the lot and the ocean have attained a height of 10 to 12 ft. and protect the property from seasonal storms.

Parcels 2 and 3 together (Tract 8–612), also shown and cross-hatched on Exhibit A, comprise a 29.44 acre tract, about a quarter of a mile from Parcel 1. Tract 8–612 is not a part of the platted subdivision known as South Ocean Beach, but lies immediately to the west of the right-of-way for the paper road called Coastal Highway. It is highly unlikely that Coastal Highway would ever have been built, because large portions of the projected right-of-way are covered with water at all times, including the portions immediately north and south of the Clements' property. Of the 29.44 acres, 15.32 are fast land, 12.-39 are under water and 1.73 are subject to the ebb and flow of the tides. The 1.73 acres lie along the northern edge of the thin peninsula facing on Pope Bay and on both sides of the slough which runs east and west through the middle of the tract.[7] The 2.54 acres which comprise Parcel 2 are shown by a dotted line on Exhibit A.

The case has been tried before the court without a jury, and the parties have stipulated that the court may consider all of the evidence offered during the previous non-jury trials, as well as the evidence offered during this trial.

The court adheres to the findings of fact in Opinion No. 3 (including those adopted from the earlier opinions) as those findings are modified by Findings 4.1 to 4.5, inclusive, in Opinion No. 4, to which the court also adheres. They are supplemented by Findings 5.1 to 5.4, herein.

The court also adheres to the conclusions of law stated in Opinions Nos. 1, 2, 3 and 4,[8] as supplemented by the conclusions stated herein.

*Valuation of the Tracts*

*Tract 8–573 (Parcel 1).* The Government's appraiser estimated the reproduction cost of the dwelling, including the well, sewage disposal system and electrical connections, at $51,075, including a 50% markup for labor and materials because of the location. He deducted $5,107.50 (10%) for depreciation and

son, but not later than April 1 of any year; subject, further, to the right of the GOVERNMENT to operate, maintain, and construct or reconstruct a public access way over and across said Tract 8–612 following an existing access way as shown on the attached [plat]. * * *

"PROVIDED, that such use and occupancy for noncommercial residential purposes and for hunting purposes shall be subject to [various general rules and regulations and specific provisions, reservations, terms and conditions set out in the agreement]." See fn. 18.

6. Described in Findings 22 and 23 in Opinion No. 3, 324 F.Supp. at 1174.

7. The parties agree that under Maryland law, title to the 1.73 acres is in the State of Maryland. Board of Public Works v. Larmar Corp., 262 Md. 24, 277 A.2d 427 (1971); Van Ruymbeke v. Patapsco Industrial Park, 261 Md. 470, 276 A. 2d 61 (1971); Owen v. Hubbard, 260 Md. 146, 271 A.2d 672 (1970); Assateague Island Condemnation Cases, Opinion No. 1, United States v. 222.0 Acres of Land, etc., 306 F.Supp. 138 (D.Md.1969).

8. 306 F.Supp. 138 (D.Md.1969); 311 F. Supp. 1039 (D.Md.1970); 324 F.Supp. 1170 (D.Md.1971), and 354 F.Supp. 1233 (1972), respectively.

added $5,000 for the lot, giving a figure of about $51,000, to which he added 10% for "assembly" because of its proximity to the other Clements' tract (improved by a boathouse and used for hunting and other recreation), resulting in a final valuation of $56,000.

The only evidence offered by Clements with respect to Parcel 1 was that of an insurance adjuster, who estimated the reproduction cost of the dwelling, including such improvements, facilities and appurtenances as two Franklin stoves, a septic tank and field, a well, pump and tank, and various kitchen appliances, at $68,818 (including a 50% markup for labor and a 33⅓% markup for material), from which he deducted 3% for three years depreciation at 1% a year, giving a final figure of $66,754. To this Clements would add $5,250, the value fixed by the court in Section A of this opinion for similarly located lots, giving a final proposed valuation of $72,004. Clements would add nothing to the value of this tract for "assembly", because he proposes a different use for the other tract.

 *Finding 5.1* The reproduction cost (new) of the house would be $63,-000; depreciation should be different for the older portions and for the newer portions, even though the older portions have been renovated, and 8% overall ($5,040) is a fair figure for depreciation. This gives $57,960 as the value of the house, to which should be added $5,250 as the value of the lot, a total of $63,210. The question of assembly will be discussed below.

*Tract 8–612 (Parcels 2 and 3).* It is not disputed that the present zoning of this tract is C–1, a conservation zone, basically to be preserved in its natural state, but permitting the land to be subdivided into two-acre lots, which could be built upon for seasonal occupancy if sewage disposal could be taken care of under applicable federal, state and county regulations. This would not be too difficult for the land south of the slough, but the court finds that it would not be practical for the land north of the slough, which is largely marsh. The tract was bought by Clements in 1964 for recreational purposes, including hunting, for $7,000 payable over a period of years. Clements had no idea of subdividing the tract. A bill for the creation of the Assateague Island National Seashore had been introduced in 1963, and the bill which eventually became law was introduced and passed in 1965.

As noted above, 12.39 acres of the tract are under water and 1.73 acres are subject to the ebb and flow of the tides.[9] A part of the remaining 15.32 acres is forested, a part is savannah (grassy land predominantly dry) and a part is marsh land, some of which is inundated during periods of exceptionally high tides. The average elevation of the 15.-72 acres of fast land, plus 1.73 acres subject to the ebb and flow of the tides, is 3.6 ft. above MLW.

A consulting engineer-surveyor, called by the Government, gave convincing testimony that residential development of the tract is not economically feasible, because of the cost of building roads and bringing in fill to obtain satisfactory percolation, as well as other costs involved in such development.[10]

The appraiser called by the Government testified that the highest and best practical use of the tract is for hunting and other recreational purposes, because development for residential purposes would be so beset with formidable problems presented by federal, state and county environmental and other standards that residential development would be impractical.[11] He valued the boathouse at its reproduction cost, which he found to be $16,500, and valued the 15.32

---

9. See fn. 7.

10. To say nothing of the insect pests which infest the marsh land throughout the island in warm weather.

11. These standards are in evidence and need not be detailed.

acres of fast land at $18,400 ($1,200 per acre), a rounded total of $35,000 for Tract 8–612, plus 10% for "assembly", i. e. usability with the dwelling on the other tract.

The insurance adjuster called by Clements gave the reproduction cost of the boathouse as $18,466.59.[12]

The case is atypical in that Clements did not testify himself and offered no opinion evidence of the fair market value of any of the three parcels or of his retained rights. With respect to Tract 8–612 he offered the opinion of a land surveyor with experience in land planning and development and familiarity with state and county building regulations, that it is possible to subdivide the land area of Tract 8–612 into 24 lots, each containing 20,000 sq. ft. and all but one having a frontage either on Pope Bay or on the slough which divides the land portion of that tract;[13] that before such a subdivision plat could be recorded it would be necessary that all subdivision requirements of the Planning Commission, the State Health Department, and the Road authorities be met; that to rezone the tract would require approval of the county commissioners after the Planning and Zoning Commission has considered and reported whether the requirements of Article 66B of the Maryland Code have been met; that, in his opinion, if the Government had not taken over Assateague Island there is a reasonable probability that Tract 8–612 could have been subdivided and rezoned, on the theory that it would be an extension of existing land use, continuing the "growth pattern" of South Ocean Beach. He conceded that the elevation of the several lots would have to be raised to 7 ft. above MLW before a particular lot could be built

upon, and that percolation tests would have to be passed before septic tank systems could be used, but said that chemical type toilets, serviced by licensed scavengers, could be used without percolation tests. He had made no cost estimates with respect to sewage disposal nor any percolation tests on any of the property, although such tests would be required if septic drain fields were to be used.

In rebuttal the Government produced persuasive evidence from the Regional Supervisor of the State Health Department that a plan calling for a chemical waste disposal system would not be approved, except in an emergency situation.[14] The sewage disposal system of the boathouse, recently installed, is already in trouble. The witness also called attention to the National Shellfish Sanitation Program Manual of Operations, issued by the U. S. Public Health Service, regarding the discharge into marshes of effluent which would affect the sanitation of shellfish growing areas, such as the shellfish area in Pope Bay off this tract, and would be an additional obstacle to the suggested development.

The general principles governing condemnation awards have been frequently stated, most recently by the Supreme Court in Almota Farmers Elevator & Warehouse Co. v. United States, 409 U.S. 470, 93 S.Ct. 791, 35 L.Ed.2d 1, and in United States v. Fuller et al., 409 U.S. 488, 93 S.Ct. 801, 35 L.Ed.2d 16, both decided on January 16, 1973. They need not be repeated here.

In United States v. Meadow Brook Club, 259 F.2d 41 (2 Cir. 1958), the Court said:

> " * * * It would be improper to value the property as if it were actually being used for the more valuable

---

12. Both he and the Government appraiser made allowance for the extra cost of labor and materials due to location.

13. Pope Bay is a small bay leading into Chincoteague Bay. Its mean depth off Tract 8–612 is 2.03 ft. Most of the slough can be used by small boats much of the time.

14. See Maryland State Department of Health and Mental Hygiene, Regulations 10.03.27—Governing Individual Water & Sewerage Systems Where Public Water & Sewerage Systems Are Not Available, and Regulations 10.03.28—Governing Water Supply and Sewerage Systems in the Subdivision of Land.

purpose. But the 'extent that the prospect of demand for such use affects the market value while the property is privately held' should enter into the calculation. Olson v. United States, supra, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236. Obviously the more profitable operation must be one allowed by law to be carried out on the premises. Thus if existing zoning restrictions preclude a more profitable use, ordinarily such use should not be considered in the evaluation. Westchester County Park Commission v. United States, 2 Cir., 143 F.2d 688, certiorari denied, 323 U.S. 726, 65 S.Ct. 59, 89 L.Ed. 583. On the other hand if there is a reasonable possibility that the zoning classification will be changed, this possibility should be considered in arriving at the proper value. This element, too, must be considered in terms of the extent to which the 'possibility' would have affected the price which a willing buyer would have offered for the property just prior to the taking." 259 F.2d at 45.

In United States v. Hickey, 360 F.2d 127 (7 Cir. 1966), the Court said:

" * * * 'Lot-method' appraisal is a reflection of a value which may be achieved at some time in the future when the land is subdivided, improved, and ready to be sold in individual residential lots. It does not reflect the present fair market value of the vacant land, that is, what it would bring if exposed for sale on the open market, with both buyer and seller acting without duress and with full knowledge of the facts. * * * " 360 F.2d at 137.

See also United States v. Mattox, 375 F.2d 461, 464, 465 (4 Cir. 1967); United States v. Easement & Rt. of Way 100 Ft. Wide, Tenn., 447 F.2d 1317, 1319 (6 Cir. 1971); United States v. Iriarte et al., 166 F.2d 800, 804 (1 Cir. 1948).

In Cunningham v. United States, 270 F.2d 545, 549 (4 Cir. 1959), a commission had found that one of the several tracts taken was suitable for subdivision development. The Court noted, at p. 549, that there had been "a proper regard for the rule which prohibits valuation of land not yet effectively subdivided as if it had been". In *Cunningham,* the subdivision had been plotted several years before the actual taking and seven lots had already been sold.

■ *Finding 5.2.* (a) The subdivision suggested by Clements' witness would probably not have been approved, and (b) even if it were approved, its development would have been so costly that it would not have been economically feasible for Clements or anyone else to develop it.[15] It would not increase the value of the tract above the land value of $18,400 given by the Government appraiser, plus $17,500, which the court finds to be the reproduction cost of the boathouse, a total of $35,900, plus an allowance for "assembly" as suggested by the Government's appraiser.

■ *Finding 5.3.* In view of the findings in 5.2, the court will add 10% for "assembly" to both tracts.

The fair market value of Tract 8–573 is, therefore, $63,210, plus $6,321, a total of $69,531.

The fair market value of Tract 8–612 is, therefore, $35,900, plus $3,590, a total of $39,490.

The two awards must be reduced by the fair market value of the rights retained by Clements. 16 U.S.C. 459f–1 (d).

### The Value of the Rights Retained by Clements

The valuation of the rights retained by Clements in the three parcels presents a question as to which no directly applicable authority has been cited or found. The terms and conditions of the agree-

---

15. Moreover, there is a great deal of land lying between the several sections of Ocean Beach and South Ocean Beach and the body of water known in some places as Chincoteague Bay and in others as Sinepuxent Bay; some of it is similar to Tract 8–612 and would have excellent views across the Bay.

ment are set out at length in fn. 5, above. Clements' rights under the agreement are essentially a leasehold right, with the rent paid in advance as an offset to the fair market value of the property. See 16 U.S.C. 459f–1(d), quoted in fn. 4, above. The Government's interest is essentially a reversionary interest.

The Government's appraiser attacked the problem by calculating the value of the reversion. He began with the present value of Tract 8–573 (Parcel 1), as he had appraised it, and applied to that value a "reversion factor". He arrived at that factor by assuming that a prudent owner would want an annual rental of 11.5% on the property to cover the 7.46% which high grade corporate securities would yield him, plus 1% for risk, ½% for illiquidity, ½% for management, and 2% for depreciation. He cut the 11.5% down to 6% because he did not believe that in this situation he could properly use the market rate. He therefore applied what he called a "6% reversion factor", by (1) determining from an appropriate table that $1 due 25 years from now is worth $.233 today, assuming an interest rate of 6%, and (2) multiplying his estimate of the present value of the tract (including assembly), $56,000, by .233, (3) taking the product, $13,048, as the value of the Government's reversion, and (4) subtracting that figure from his estimate of the present value, $56,000; the difference, $42,952, is his estimated value of Clements' retention rights in Tract 8–573 (Parcel 1).

The Government's appraiser applied the same technique to Tract 8–612 (Parcels 2 and 3). With respect to Parcel 2 (the boathouse and the 2.54 acres around it), he multiplied his valuation of that parcel ($16,500 for the boathouse, $3,100 for the 2.54 acres around it, plus $2,000 for assembly, a total of $21,600) by his "6% reversion factor" of .233, resulting in a value for the Government's

reversion of $5,033, which, substracted from his estimated valuation of Parcel 2 ($21,600), left $16,567 as his estimated value of Clements' retention rights in Parcel 2.

With respect to Parcel 3, he used a "3% reversion factor" rather than a "6% reversion factor", because Clements' hunting rights in Parcel 3 can be used only during the hunting seasons. The present value of $1 due 25 years from now is $.4776, assuming an interest rate of 3%. He valued the land portion of Parcel 3 (12.78 acres) at $1,200/acre, plus 10%, a total valuation of $16,870; multiplied that value by his "3% reversion factor", .4776; took the product, $8,050, as the value of the Government's reversion; subtracted that figure from his present valuation of Parcel 3 ($16,870); and gave the difference, $8,820, as his estimated value of Clements' retention rights in Parcel 3.[16]

Clements rejected the Government's approach to valuing the retention rights, which he called a leaseback. He argues that "the onerous nature of the leaseback and the number of difficulties and uncertainties involved in it require that valuation be accomplished through an approach which places a monthly dollar rental on the premises, annualizes that figure, and then reduces it to present value for the 25-year period".

Clements offered the testimony of an experienced realtor and appraiser, who estimated the reasonable rental value of Parcel 1 (the house and lot) under the terms and conditions of the agreement as $1,440/yr., of Parcel 2 (boathouse and 2.54 acres surrounding it) as $300/yr., and of the hunting rights over Parcel 3 as $100 yr., a total of $1,840 yr. for both tracts. Those rental figures do not accord with Clements' claim that his house and lot are worth $72,000 and the boathouse over $18,000, apart from the land

16. His estimate of Clements' retention rights in Tract 8–612 is therefore $25,387 (the sum of his estimate of the reten-

tion rights in Parcel 2 ($16,567) and in Parcel 3 ($8,820).

on which it is situated.[17] On the other hand, the court believes that in this case, at least, the objections of Clements to the Government's approach have merit, and that his approach, with more reasonable figures, is a proper one. Essentially Clements is paying 25 years rent in advance.

The court has considered: Almota Farmers Elevator & Warehouse Co. v. United States, supra; the authorities cited therein; the somewhat analogous problems involved in valuing remainders or reversionary interests for estate or gift tax purposes, see Federal Tax Regulations, 1972, vol. 2, § 20.2031–10(d) and (e), p. 939, particularly Table B on p. 941, as well as the tables offered in evidence, and in valuing leased property and possessory and future estates for condemnation purposes, see Nichols on Eminent Domain, vol. 4, § 12.42, p. 290 et seq., and § 12.46, p. 330 et seq.

There are factors which tend to make the rental value of the property rights which Clements is retaining for 25 years less than what the rental value of the Clements' properties would have been if Assateague had not been taken over by the Government; there are also factors which have the opposite effect. This opinion would be unduly prolonged by analyzing those factors.[18]

*Finding 5.4.* After considering all the evidence, arguments and authorities cited, the court finds:

(1) That the fair annual rental for the rights reserved by Clements under the agreement are: (a) $2,880 per year for the dwelling and the .46 acre lot on which it is located (Parcel 1); (b) $450 per year for the boathouse and surrounding 2.54 acres (Parcel 2); and (c) $150 per year for the hunting rights on Parcel 3; a total of $3,480 per year.

(2) That 6% per annum is the proper rate to be used to determine present worth of payments to be made in the future, i. e. reduce to present value the sum of $3,480 per year payable over a period of 25 years. The table used by both parties shows what $1 due in the future is worth today, at various rates. Using the 6% column and adding the figures for 1 through 25 years, gives a factor of 12.7835, which, multiplied by $3,480, gives a total present worth of the reversion rights as $44,486.58.

That figure should be divided between the tracts as follows, to determine the separate awards for the two tracts. The proper division is $36,816.48 for Tract 8–573 (Parcel 1) and $7,670.10 for Tract 8–612 (Parcels 2 and 3).

Finally, therefore, the awards of just compensation to Clements et ux, giving effect to the reservation rights, as required by 16 U.S.C. 459f–1(d), are:

(1) For Tract 8–573, $69,531 less $36,-816.48, i. e. $32,714.52.

(2) For Tract 8–612, $39,490 less $7,-670.10, i. e. $31,819.90.

17. The $1,440 per year rental which Clements suggests for Parcel 1 (the house and lot) is just 2% of the figure at which Clements values the Parcel, and less than 2 1/10% of the figure awarded by the Court. His suggested rental for the boathouse and the 2.54 acres surrounding it is 1 6/10% of his estimated reproduction cost of the boathouse, and 1 7/10% of the figure used by the court.

18. The court has found that, in the absence of the project, by 1972 there would probably have been one road down the entire length of Ocean Beach and South Ocean Beach, which would have passed within 200 ft. of Clements' house. There is no usable road down the island now, and no firm plans to build one. The value of the hunting rights will be reduced by public use of Parcel 3 during much of the year. Under the agreement (see fn. 5, above) Clements will have to pay all insurance premiums, any taxes assessed on the tracts and some items of maintenance customarily or often paid by a landlord. There are provisions for forfeiture if Clements or his successors, invitees and employees violate certain provisions of the agreement. On the other hand, the combination of dwelling, boathouse and hunting rights, will be unique on Assateague. The Clements' house will have an ocean view, unobstructed by houses on the ocean front lots. The privacy question alone has many facets, some of which tend to increase the value of the retention rights and some to reduce the value.