UNITED STATES of America,
Plaintiff,

v.

1,629.6 ACRES OF LAND, MORE OR LESS, IN the COUNTY OF SUSSEX, STATE OF DELAWARE and the Island Farm, Inc., et al., Defendants.

Civ. A. No. 3532.

United States District Court,
D. Delaware.

June 15, 1973.

Ralph F. Keil, U. S. Atty., Wilmington, Del., Charles F. MacMullan and Harry W. McKee, Attys., Dept. of Justice, Washington, D. C., for United States.

James M. Tunnell, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., and Ralph J. Luttrell, Washington, D. C., of counsel, for defendant, The Island Farm, Inc.

## OPINION

CALEB M. WRIGHT, Chief Judge.

This is an action brought by the United States of America to condemn 1,635.-52 acres of land in Sussex County, Delaware, for use in connection with the Prime Hook National Wildlife Refuge of the Bureau of Sports Fisheries and Wildlife, United States Department of the Interior.[1] The defendants are The Island Farm, Inc. (Island Farm), owner of 1,632.2 acres of the condemned lands and Jennie H. J. Layton (Layton) owner of the balance of the acreage.

In August of 1972, the issue of just compensation was tried to a three man commission (Commission) appointed pursuant to Rule 71A(h) F.R.Civ.P. During the course of the trial, Layton and the United States agreed on the amount of just compensation and settled that aspect of the litigation without resort to the Commission. On January 23, 1973, the Commission rendered its report determining just compensation for Island Farm to be $1,338,892.00.[2] Subsequent thereto, Island Farm and the United States filed their respective objections to the Commission's report and replies to their opposite's objections. The case is presently before the Court for a review of the report in light of the objections raised by the parties.

The Commission's findings and report are to be reviewed by this Court in the manner prescribed in F.R.Civ.P. Rule 53(e)(2) and F.R.Civ.P. Rule 71A(h). The district court review is of a limited nature, United States v. Certain Parcels of Land, 215 F.2d 140, 146 (3rd Cir. 1954), and the Commission's findings of fact must be accepted unless "clearly erroneous." F.R.Civ.P. Rule 53(e)(2). The scope of review has been frequently described as follows:

Upon review, it was the duty of the court to accept the awards of the commission unless they were clearly erroneous in whole or in part because based upon a substantial error in the proceedings, because based upon a misapplication of the controlling law, because unsupported by substantial evidence, or because contrary to the clear weight of all the evidence. And while it was incumbent upon the court to proceed with due regard for these general principles, if on the whole record the court was clearly convinced that in fixing just compensation for the property taken the commission acted arbitrarily and without proper regard for the evidence, or that the awards were unsupported by any substantial evidence, or that they were against the clear weight of all the evidence, it was the duty of the court to modify them, reject them in whole or in part, receive further evidence, or recommit the matter to the commis-

1. The United States initiated this suit against The Island Farm, Inc. (Island Farm) to condemn 1,629.6 acres of land. Subsequent to its initial Declaration of Taking, the Government learned that title to certain portion of the condemned acreage was in dispute, and amended its complaint to join Mrs. Jennie H. J. Layton (Layton), the individual claiming title adverse to Island Farm. As a consequence of the resolution of the title dispute, the government amended the Declaration of Taking to include an additional 5.92 acres of land or a total of 1,635.52 acres. For the Court's discussion of the facts and law pertinent to this question see 335 F.Supp. 255 (D.Del.1971).

2. The report is entitled "Findings of Fact and Conclusions of Law Constituting the Report of Murray M. Schwartz, Ralph K. Gottshall and Robert G. Hackett, Members of a Commission Appointed by the United States District Court for the District of Delaware on July 31, 1972." (Docket Item #131).

sion with instructions. United States v. Waymire, 202 F.2d 550, 553–554 (10th Cir. 1953).

See also 7 Moore, Federal Practice ¶71A.90 [9–5], p. 71A–519 and cases cited therein. Absent specific objections by the parties, the district court would not be required to examine the record for error and could accept the non-objected to portions of the report without a verbatim review of the transcript. See United States v. Certain Lands in the City of Statesboro, etc., 341 F.2d 742, 744–745 (5th Cir. 1965).

In light of the breadth of certain of the objections pressed by the parties, the Court has undertaken a comprehensive review of the entire transcript and exhibits as well as the arguments and authorities relied on by both parties in their objections to the Commission's report and in the initial briefs and suggested findings of fact and conclusions of law which the parties submitted to the Commission for its use in the determination of the appropriate just compensation and the preparation of its report. This examination has convinced the Court that, for reasons which will be discussed subsequently, the parties' objections are without merit and that the Commission's findings are supported by the substantial weight of the evidence. In addition, the report clearly delineates the reasoning process which the Commission utilized in assessing damages and evidences that the Commission acted in a non-arbitrary fashion with proper regard for the evidence, the legal standards applicable to condemnation actions, and the instructions as presented by this Court. See United States v. Merz, 376 U.S. 192, 84 S.Ct. 639, 11 L.Ed.2d 629 (1964). Therefore, the Court accepts and affirms the findings and report of the Commission and adopts them as its own.

The plaintiff raises four primary objections to the Commission's report and findings: 1. The Commission erred in rejecting the comparable sales valuation approach and adopting the income capitalization approach for determining damages for the 366 acres of sand and gravel deposit; 2. the Commission erred by finding two separate and distinct best uses for portions of the Island Farm land and in using a summation approach of valueing each portion separately and combining the separate values to determine total damages; 3. the Commission erred in granting the defendant's motion to strike the Government's experts' testimony regarding certain sales to the Delaware Fish and Game Commission; and 4. the Commission erred in allowing damages for the diminution of value for the remaining 6.3 acres of Island Farm's property and in allowing greater damages than any of the evidence would support.

■ The Government's first objection regarding the rejection of the comparable sales method of valuation is comprised of several components. The first is that even if the comparable sales of sand and gravel deposits were insufficient to conclusively establish market value, they are still the best evidence of value and should not have been rejected by the Commission. See United States v. Toronto, Hamilton & Buffalo Navigation Co., 338 U.S. 396, 402, 70 S.Ct. 217, 94 L.Ed. 195 (1949) and United States v. Trout, 386 F.2d 216 (5th Cir. 1967). However, the Commission found that none of the sales of land testified to by the Government's experts were, in fact, comparable as sales of lands containing commercially exploitable sand and gravel. The fallacy in the Government's argument is its underlying reliance on its basic contention that the Island Farm property did not contain a unique commercially developable sand and gravel deposit. At the trial, the Government presented testimony from its expert valuation witnesses and a geologist to establish that numerous sand and gravel deposits of the type situated on Island Farm were located in Sussex County and that the Island Farm deposit was not sufficiently unique in character to support a commercial operation. After concluding that most of his comparable properties contained similar deposits one

of the Government's valuation experts, Bernard C. Meltzer (Meltzer) allowed no damages for enhancement in value for gravel and sand. These conclusions, specifically the contention that other Sussex County properties contained commercially developable sand and gravel, were explicitly rejected by the Commission. The Commission accepted the testimony of Island Farm witnesses, e. g., experts in analysis of such mineral deposits and individuals involved in commercial utilization of sand and gravel, concerning the unique aspects of the Island Farm deposit and its commercial feasibility. In light of this finding, there were no properties which the Commission could use as comparables to ascertain the market value of the 366 acre sand and gravel deposit. The issue of the uniqueness and commercial suitability of the Island Farm sand and gravel is one over which there was substantial dispute. The Commission's conclusions on the issue have abundant evidentiary support and are accepted by the Court. In light of the absence of any comparable sales, it was entirely proper under the law and the instructions of this Court for the Commission to employ the income or capitalization approach as a guide to a determination of just compensation. See Cade v. United States, 213 F.2d 138 (4th Cir. 1954); United States v. Corbin, 423 F.2d 821 (10th Cir. 1970); and National Brick Co. v. United States, 76 U.S.App.D.C. 329, 131 F.2d 30, 31 (1942).

The second aspect of the Government's objection to the Commission's use of the income capitalization approach to ascertain just compensation is that the Commission allegedly improperly valued the mineral deposit separately rather than determine the market value of the land as a whole because of the presence of the deposit. See United States v. 158.76 Acres of Land, 298 F.2d 559 (2nd Cir. 1962) and Georgia Kaolin Co. v. United States, 214 F.2d 284, 286 (5th Cir. 1954) cert. den. 348 U.S. 914, 75 S. Ct. 294, 99 L.Ed. 716 (1955). Moreover, the Government contends that the capitalization adopted by the Commission embodied a mere multiplication of tons times price, a technique uniformly rejected by the courts. See United States v. Upper Potomac Properties Corporation, 448 F.2d 913 (4th Cir. 1971); United States v. Sowards, 370 F.2d 87, 90–91 (10th Cir. 1966); and United States v. Whitehurst, 337 F.2d 765 (4th Cir. 1964). As the Commission correctly indicates, the Island Farm valuation witness Robert Hickman (Hickman) did not utilize a unit price times volume mechanism. The criticism most frequently cited against the simplistic price-tons approach is that it disregards market realities in that it assumes stable demand, competition, production costs, etc., and does not reflect the risks and uncertainties inherent in the operation of an enterprise. See United States v. Sowards, supra, 370 F.2d 90–91, and United States v. Whitehurst, supra. Mr. Hickman specifically examined and considered these factors in his calculation of the income stream upon which he computed damages. Not only did he employ an in the ground sale price for sand and gravel to eliminate any of the uncertainties of production and processing costs incumbent upon the integrated gravel operation which several of the defendant's witnesses testified was feasible for the Island Farm deposit, but he also reduced the deposit's potential market share of a proven and ascertained market demand by fifty per cent in anticipation of outside competition when several of the landowner's witnesses testified that the Island Farm sand and gravel operation could command the entire applicable market by reason of its location and existing hauling costs. The Court agrees with the Commission's acceptance of Hickman's income analysis as one which adequately considered the necessarily conjectural and speculative aspects of any income approach. United States v. Silver Queen Mining Co., 285 F.2d 506, 509–510 (10th Cir. 1960), and the requisite elements of market demand, mineral quality, etc. See United States v. 1,291.83 Acres of Land, 411 F.

2d 1081 (6th Cir. 1969) and Mills v. United States, 363 F.2d 78 (8th Cir. 1966). See also United States v. 180.37 Acres of Land, 254 F.Supp. 678, 682–683 (W.D.Va.1966) (affirming use of unit-price approach).

■ The third component of the Government's objection to the Commission's income approach is its adoption of a 10% capitalization rate for determining the present value of the anticipated income stream without any evidence of the appropriate capitalization rate ordinarily utilized in the sand and gravel business. See United States v. Whitehurst, supra, 337 F.2d at 772–773; United States v. 158.76 Acres of Land, supra 298 F.2d at 561 and United States v. Leavell & Ponder, Inc., 286 F.2d 398 (5th Cir. 1961).[3] However, the Government has mischaracterized the process through which the Commission determined the present value of the anticipated $75,000 per year income stream as one in which requiring a capitalization rate as the term is used in the above cited cases. The method of calculation employed by Hickman is readily distinguishable from the methods utilized in the capitalization cases relied on by the Government in which the appraisal involved capitalization of income from an ascertained capital expenditure or from a known annual income for a business. In these latter situations, the rates selected necessarily include a risk factor reflective of the uncertainties in the particular enterprise. However, Hickman had already included the elements of risk and uncertainty, e. g., market demand, competition, amount of deposit extracted, mode of transport,

in calculating his income stream of $75,000 a year for twenty years, and there was no necessity of using a capitalization rate which embodied these risks. The Commission, therefore, merely discounted what was considered to be a known or risk-free income stream. This discounting process is substantially similar to any actuarial determination of the present value of an annuity through the use of an appropriate market interest rate. The 10% rate was certainly a reasonable if not somewhat conservative rate for 1968, and the Commission had ample support for its use.

Finally, the Government argues that there was no evidentiary support for the market demand adopted by Hickman for gravel and sand. An examination of the record reveals sufficient and substantial support.

■ The Government's second objection that the Commission improperly determined two highest and best uses for separate parts of the condemned acreage, and then valued the portions separately under an improper summation approach is also without foundation. An examination of the Commission's report evidences that the Commission was continually aware of its obligation to value the property as a whole. The Commission's conclusion that the highest and best use of the property was 1,266.2 acres of farm and recreation land utilized in the manner the landowner was using it and 366 acres utilized for a sand and gravel pit was permissible under the evidence, the Court's instructions and the applicable law.[4] See Cade v. United States supra, 213 F.

---

3. The following statement is typical of those upon which the Government relies in contesting the Commission's acceptance of a 10% "capitalization rate."
   "The capitalization or interest rate selected and applied in the formula used here reflects the degree of risk in the undertaking involved. It is an extremely important figure in the computation because a change of even a fraction of a per cent will produce a surprisingly material change in the result." United States v. Whitehurst, supra, 337 F.2d at 772.

4. It should be noted that the Government's own valuation witnesses effectively attributed different highest and best uses and a consequent difference in value on the 1632 acre condemned parcel and the 6.3 acre beach front acreage. Although Meltzer and Goldsborough's testimony discusses the post-condemnation use and value of the 6.3 acres, their estimates of value for the pre-taking and post-taking parcels evidences that the 6.3 acres would have been more valuable presumably by reason of their suitability for residential recreational usage.

2d at 140; Tlingit & Haida Indians v. United States, 389 F.2d 778, 182 Ct.Cl. 130 (1968); Cunningham v. United States, 270 F.2d 545 (4th Cir. 1959); United States v. 2,208.88 Acres of Land, 330 F.Supp. 1045 (E.D.Mo.1971); Wilson v. United States, 350 F.2d 901 (10th Cir. 1965). Moreover, the Commission specifically avoided any duplication of valuation by not attributing two highest and best uses to the same acreage and by not accepting conflicting and incompatible uses. See e. g., United States v. Cunningham, 246 F.2d 330, 333 (4th Cir. 1957); and United States v. Carroll, 304 F.2d 300 (4th Cir. 1962).

■ In addition, the method of valuation utilized by the Commission, i. e., the comparable sales approach to value the 1,266.2 acres of farm and recreational land and the income approach to value the sand and gravel acreage, did not constitute an impermissible summation procedure. The Commission's report includes an extensive and accurate assessment of the cases in which a Commission's report was unacceptable because of an erroneous summation of component values. The Court agrees that much of the apparent inter-circuit conflict on the propriety of summation constitutes semantic confusion rather than actual disagreement over the appropriate legal standards. Whenever various portions of a condemned parcel are susceptible to different highest and best uses and no comparables are available for valuation of one or both portions, a form of summation will necessarily be employed. However, when, as the Commission did here, the determination of just compensation is reached by viewing the property as a single whole parcel with compatible component highest and best uses, the ascertainment of different per acreage values for the various different parcels and the ensuing calculation of overall damages does not involve an impermissible valuation technique. See

Cade v. United States, supra, 213 F.2d at 140; United States v. 1,955.00 Acres of Land, 447 F.2d 673, 674–676 (10th Cir. 1971); United States v. 2,208.88 Acres of Land, supra; and Cunningham v. United States, 270 F.2d 545, supra.

■ The Court overrules the Government's objection to the Commission's decision to strike the testimony of its expert valuation witnesses concerning sales to the Delaware Fish & Game Commission. The Commission was not satisfied that the sales were free from compulsion or coercion, and the record is adequate to support this position. In such circumstances, exclusion of the proffered sales is appropriate. See Transwestern Pipeline Co. v. O'Brien, 418 F.2d 15, 17–18 (5th Cir. 1969).

■ The Government's final objection is to the allowance of a diminution in value to the 6.3 acres remaining after the taking. The Commission's resolution of conflicting testimony and conclusion that such a diminution in value occurred by reason of the landowner's loss of access to his acreage is supported by sufficient evidence. In addition, its assignment of damages for this element in the amount of $31,500 on the basis of expert valuation witness, William Mollen's (Mollen) testimony that the resulting decrease in value was $5,000 per acre merely constituted a permissible rectification of Mollen's mathematical error in calculation.

■ Island Farm raised four objections to the Commission's findings and report. The first objection is that the Commission's $529.00 per acre figure for the value of the 1,266.2 acres of non-gravel acreage is not within the range of expert testimony and is below even the Government's experts' figures. This objection is clearly erroneous. Island Farm is attempting to compare the per acre values for two substantially different tracts of land.[5] The Govern-

---

5. Island Farm has attempted to utilize the Government's per acre values for the entire Island Farm parcel including the

6.3 breachfront land remaining after the taking. The Government's experts placed values on this acreage of $157,500 ($25,-

ment's expert witnesses' testimony regarding a value for acreage comparable to the land determined to be worth $529 per acre by the Commission was approximately $467.00 and $480.00 per acre.

The remaining Island Farm objections concern the Commission's failure to strike or disregard the testimony of certain of the Government's expert witnesses and the concomitant impermissible effect that consideration of this testimony had on the Commission's determination of the highest and best use of the 1,266.-2 acres of non-gravel bearing land and its market value. In essence, Island Farm argues that the testimony of the Government's valuation experts was based on inadmissible sales and on an erroneous conclusion as to the jurisdiction of the United States Corps of Army Engineers (Corps of Engineers), and that in the absence of this evidence, the only testimony concerning the highest

and best use of the 1,266.2 acres was that of the Island Farm experts, i. e., use in development for resort and recreational purposes.

The fundamental error in Island Farm's argument is its contention that Meltzer and Goldsborough necessarily relied on the jurisdiction of the Corps of Engineers in their determination of highest and best use. An examination of Meltzer's testimony demonstrates that the ecological-environmental problems and the jurisdiction of the Corps of Engineers were alternative reasons for his conclusion that the highest and best use of the parcel was not development for resort and recreational purposes. The absence of market demand and the physical characteristics of the land were factors which he considered sufficient by themselves to preclude such development.[6] Goldsborough also cited the physical condition of the property as

---

000 per acre) and $138,600 ($22,000 per acre). The Commission's $529 figure did not include the 6.3 acre parcel. Obviously, the breachfront acreage had a substantial impact on the Government's witnesses' overall average per acre value for the entire pre-taking parcel, and any attempt at comparison is unfounded.

6. The pertinent portions of Meltzer's testimony regarding non-ecological factors reads as follows:

My conclusions are that it fails in that use (subdivision) for several reasons: First, as of the date of condemnation, it would fail for the economic reason; namely, the demand for a subdivision in that immediate area was not there, but even if the demand were there, it would fail for three additional reasons. Number 1, the physical facts would make it prohibitive to bring a subdivision in; second, the environment factor and the ecology factor would make it impossible to secure the necessary permits, and also the regulations existing as of that time from the state agencies. The Water and Air Resources Commission would have also made it impossible. That is, economically impossible because of cost factors.

\* \* \* \* \*

In addition, we are dealing with, physically, a parcel of ground that over most of its area has close to twenty feet of

organic matter. If you are going to excavate and pile this goo on top of goo, you have got a situation where the only way where you can contain it from the engineering standpoint is to build expensive retaining structures, because it would flow as a semi-plastic material and simply creep, as you piled it up, be flowing back into the channel from which you dug it.

No. 2, it would have no perc.

No. 3, you simply cannot make a subdivision of that type of material. You would have to haul it out, get rid of it, and bring in other material unless you were willing to build these expensive interlocking retaining structures and simply wait year after year after year, many years, and even then you would have something with almost impossible percolation.

So therefore, for these very reasons, namely, from the economic reason, the cost angle—and another thing, by the way, the only way you could have developed it in 1968 to meet the requirements of the State would have been to put in an expensive multimillon dollar sewer plant before you even start, before you even get your first dollar back, and even then there was a question as to whether it would go.

So based upon demand, based upon costs—but even if demand somehow were there, which it is not, and even

preventing development. In addition, regardless of the nature and extent of the Corps of Engineers' jurisdiction, the Commission had before it the testimony as to the value and physical characteristics of the several experts' comparables, as well as the evidence concerning the physical characteristics of the condemned land. This evidence provides ample support for the Commission's conclusion that:

"As of May 6, 1968 and the then reasonably foreseeable future, the condemned parcel was so unattractive for resort and recreational development so as to make the same speculative and conjectural. While many factors entered into the judgment of the Commission, overweighing considerations were the geographic location of the condemned parcel and the economic cost of canalling, lagooning, and raising the soil high enough for resort and recreational development." Commission Report, p. 9.

The reliance of Meltzer and Goldsborough on the inadmissible three sales to the Delaware Fish and Game Commission does not warrant striking their testimony. The Commission had before it their testimony concerning the remaining comparables and their opinions as to the elements determinative of value, and could make any necessary adjustments for the effect of the stricken sales. To rule otherwise would effectively eliminate the Commission method of valuation unless the Court made a concurrent or prior ruling on the admissability of any comparables and permitted the experts an opportunity to amend their opinions in light of these evidentiary rulings.

The testimony of the Governmental witnesses concerning the Corps of Engineers' jurisdiction was an integral and valid aspect of its case. Under the Government's factual contentions, substantial portions of the Island Farm acreage was marsh and directly affected by tidal flow. Therefore, the testimony of the Government's witnesses, particularly Lewis Caccese, concerning jurisdiction of the Corps of Engineers over such lands was relevant and admissable. The Commission's failure to determine the facts in the manner argued for by the Government does not require striking all testimony concerning ecological considerations any more than the Commission's conclusion that the parcel was not suitable for resort and recreational development necessitates striking the testimony of the Island Farm witnesses regarding the feasibility, costs and techniques of such development. These conclusions are instead factors in determining the weight or relevance to be attributed specific testimony in reaching a final determination of damages.

Under its factual findings, the Commission did not have to reach the legal issue of the Corps of Engineers' jurisdiction and properly declined to do so. The record supports the Commission's factual findings and the Court concurs in its conclusion not to decide the jurisdictional question.

Island Farm's final objection is that although the Government and the Commission determined the highest and best use of the 1,266.2 acres to be the use to which the landowner was employing them, neither gave any value to the landowner's improvements, e. g., buildings, ditches and lagoons. The burden of establishing just compensation is on the landowner who was clearly apprised of the Government's contentions regarding highest and best use. It was therefore incumbent upon Island Farm, either directly or through cross-examination of the Government witnesses, to elicit evidence of the enhancement value of these improvements. On the basis of the record, the Commission had no evidence before it which would substantiate any damages for the

if you could overcome the cost angle, which is prohibitive, it still would fail from the standpoint of the environmental and ecology factor and it could not simply be done legally. Transcript 104–106.

enhancement value of these improvements.

For the above stated reasons, the parties' objections are denied and the Commission's findings and report are specifically accepted and adopted by the Court.

Submit order.