UNITED STATES of America,
Plaintiff-Appellee,

v.

6,162.78 ACRES OF LAND, More or Less,
SITUATED IN CONCORDIA PARISH,
STATE OF LOUISIANA, Defendants,

and

Ida Hoagland Yakey, et al.,
Defendants-Appellants.

No. 81–3183.

United States Court of Appeals,
Fifth Circuit.

July 14, 1982.

Frank S. Kennedy, Rellis P. Godfrey, Shreveport, La., for defendants-appellants.

Dosite H. Perkins, Jr., Asst. U. S. Atty., Shreveport, La., Steven R. Baer, Kathryn A. Oberly, Arthur E. Gowran, Land and Natural Resources Div., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before GEE, RUBIN and GARZA, Circuit Judges.

GEE, Circuit Judge:

In 1977, the United States condemned 6,162.78 acres of land in Concordia Parish, Louisiana, as part of the Tensas Basin, Red River Backwater Area Mitigation Project, and deposited $250 per acre in court. In 1979, the deposit was raised to $306 per acre. On December 11, 1980, after listening to experts provided by the landowners and the government, the jury awarded $2,071,-973, or approximately $336.21 per acre, as just compensation. The landowners appeal from this judgment, claiming that there was bad faith on the part of the government and that the verdict was not supported by the evidence. We find no merit in these contentions and affirm the judgment of the district court.

Most of the condemned property is in timberland and is surrounded by the Mississippi, Red, Black, and Tensas Rivers. The soil on the subject property is classified as sharkey-tunica clay, which is generally considered excellent for the production of soybeans. However, that soil, as classified by the United States Soil and Water Conservation Service, varies from Class 3 to Class 4. Class 4 soil is below 40 feet mean sea level and is considered hazardous to farm because the low elevation makes it subject to flooding. Class 3 soil is above 40 feet mean sea level. The elevation of the property taken by the government is largely from 35 to 40 feet mean sea level, and only 7.4 percent of the land acquired by the United States is above 40 feet. The major portion of the land is subject to backwater flooding because of its proximity to the Mississippi and Red Rivers.

At trial, the landowners' principal appraiser, Mr. McNew, testified that by using comparable sales he valued the subject tract at $522 per acre, including the timber. The comparable sales used by Mr. McNew were of land above 40 feet mean sea level, and two of the three comparable sales were cleared land. Mr. McNew admitted that the United States Soil and Water Conservation Service classifies land below 40 feet mean sea level as hazardous for farming and further admitted that he could not find a sale similar in terms of size, conditions, elevation, and trees to the subject tract. The landowners' second expert, Mr. Snyder, a real estate broker with no license to appraise real estate, valued the land, with timber, at $495 per acre. He used a series of small sales for comparison purposes, and his most comparable sale had an elevation ranging from eight to ten feet higher than the subject property. Finally, the landowners called a neighbor to testify regarding the soybean yields on 480 acres that he leases adjacent to appellants' land. Although he testified that the average soybean yield was 34.4 bushels per acre, he admitted that the land he farms is above the 45-foot mean sea level contour and, therefore, is significantly higher in elevation than the subject property, making his land far better for farming and less prone to flooding than the subject tract.

The government's principal appraiser, Mr. Russell, analyzed thirty sales and found three comparable sales. The first sale consisted of 7,767 acres of which 7,186 acres

were in timberland, as was the subject tract, and 581 acres were cropland. The property sold in 1977 for $454 per acre with the timberland valued at $196 per acre. The elevation of the property was approximately 50 feet mean sea level. The second sale that Russell relied upon was completed on July 6, 1977, and consisted of 7,319 acres with a per-acre price of $240. The third sale consisted of 729.23 acres of cutover timberland situated immediately north of the subject tract that sold in December 1976 for $404 per acre. Mr. Russell testified that when the subject property is almost completely inundated with floodwaters, this third sale property is not, thereby demonstrating that the most comparable property to the subject tract is superior in location and elevation to the property taken by the government. Logically, it follows, he pointed out, that if the sale price of the third property was $404 per acre, the value of the subject property had to be less. Based on his analysis of comparable sale values, Mr. Russell valued the property at $280 per acre for timberland and $27 per acre for timber, for a total of $307 per acre.

■ The landowners argue that the jury verdict is not supported by the evidence presented. The weighing of the evidence in a condemnation proceeding is within the sole purview of the fact-finder, and it is not for this court to reweigh the evidence. *Rousseaux v. United States*, 394 F.2d 123, 124–25 (5th Cir. 1968). Rather, we must determine whether the verdict was within the range of the evidence. *United States v. 416.81 Acres of Land*, 525 F.2d 450, 454 (7th Cir. 1975). Here the jury verdict of $2,071,973 was well within the range of the evidence. Appellants' appraisals went from a high of $3,220,000 to a low of $3,052,193. The government's appraisals ranged from a high of $1,891,973 to a low of $1,704,700. A jury finding based on sharply conflicting evidence is conclusively binding here. *Rousseaux*, 394 F.2d at 125.

The landowners argue that the United States acted in bad faith because (1) the government supposedly instructed its appraisers as to the amount of their appraisals and used the testimony of only two of the four appraisers it had hired, (2) the government's witnesses estimated that the subject land was less valuable than the amount awarded in a condemnation trial of a neighboring tract, and (3) the comparable sales used by the government's witnesses are not considered by the landowners to be comparable.

■ The gist of much of the landowners' claim of bad faith is that the government placed a predetermined value on the defendants' land and improperly required its appraisers to meet that value. There is nothing in the record to support this argument. On the date of taking, the government had two separate internal appraisals in excess of the amount of just compensation that the government deposited in the registry of the court. However, these two appraisals were not approved by the Corps of Engineers, and the government's estimate of just compensation at the time the declaration of taking was filed was based on a different approved appraisal. This was acceptable procedure. There is no principle of law requiring the government to approve of, or adopt officially, any particular appraisal that it has commissioned.

The two appraisals finally relied on by the government and presented at trial were independent appraisals. Mr. Russell was specifically questioned as to whether he had any goal in mind at the time he started his appraisal, and he responded, "[o]nly the truth." He further stated that the government furnished him only maps of the subject property and hydraulic information.[1]

---

1. When defendants' counsel cross-examined Mr. Russell as to whether the government provided him with a list of comparable sales to be used by him in valuing the subject tract, the following colloquy took place:

Q  ....  Now, sir, put back on the projector, if you would, your first chart, which was a listing of, I believe it was, 29 sales. Thank you. Now, is this the information or what the government gave you, sir?

A  Sir, the government didn't give me anything.

In addition, Mr. Davis, the second appraiser, stated on direct examination that he too was never instructed by the government to arrive at "any particular value or result" in appraising the subject property. Thus, contrary to appellants' claims, neither Mr. Russell nor Mr. Davis was instructed by the United States Corps of Engineers with respect to a predetermined amount that they were to find as just compensation for appellants' property.

■ The landowners further claim that the government engaged in bad faith by refusing to instruct its appraisers to consider the case of *United States v. 5,553.80 Acres of Land*, 451 F.Supp. 220 (W.D.La. 1978), in which an award of $541 per acre was made for condemnation of land adjacent to the subject property. The record in that case, however, is not part of the record here. The landowners' attempt to have that record introduced into this proceeding was denied by the district court because that case involved a nonjury trial to determine just compensation regarding a different parcel of land with different facts and witnesses. Moreover, the testimony in this trial indicated that the property involved in *United States v. 5,553.80 Acres* was superior to the subject tract.[2]

■ Finally, the landowners charge that the government engaged in bad faith by using sales that were not comparable because of the circumstances under which the sales were negotiated. The question of how comparable the government sales were is a jury question and not at all a question of bad faith. *Baetjer v. United States*, 143 F.2d 391, 397 (1st Cir. 1944), *cert. denied*, 323 U.S. 772, 65 S.Ct. 131, 89 L.Ed. 618 (1944). "The motivation behind our transactions can be shown, but only as affecting weight, not admissibility." *Id.*

■ The landowners argue that the jury verdict improperly denied them an award of severance damages for loss of access to their remainder tract as a result of the government's taking. The jury verdict does not indicate whether severance damages were included in the award. However, the jury was properly charged to award severance damages, if any, as it thought proper. The instructions fully delineated the issue of severance damages and how such damages were to be assessed.[3] Therefore, the

Q They didn't furnish you anything? They didn't furnish you any aids, sir?
A Maps of the subject property only and some hydraulic information.
Q And what else, sir?
A Nothing.
Q Nothing. Just maps and hydrology?
A That is correct, sir.
Q This is not the government's listing of sales?
A There may have been some sales, but in every case I confirmed the information of the sale personally, and also confirmed it with either the buyer or the seller.
Q My question was, is that not the government's list of sales they gave you?
A No, sir, that is Oren Russell's list of sales.
. . . .
Q You are sure that this was a list you made, sir?
A I am sitting here looking at the original.
Q Now, sir—and it was not based on any listing that the government had provided you?
A Absolutely not.

2. On cross-examination by landowners' counsel, Mr. Russell testified as follows:
Q So, again, we disregard what occurs on the property immediately adjacent to what the government took in this proceeding?
A The property immediately adjacent to the subject property, for the most part, had higher elevations, was better property, was more suitable to farming, would probably have a higher yield per acre of soybeans because of the higher elevation and not being subject to as much flooding as the subject property, although portions of the Angelina is subject to flooding also, but not nearly to the extent of the subject property.

3. In the following instructions to the jury, the district judge explained what is meant by severance damages and how they are determined:
When, as in this case, the government takes only a part of an owner's property, the method by which to determine the just compensation to be paid to the property owner for the taking of a part of his property is, as a general rule, to compare the fair market value of the property before and after the taking; that is, to arrive at the just compensation to be awarded by subtracting the fair market value of what remains, after the taking, from the fair market value of the whole, immediately before the taking.

jury verdict includes any severance damages the jury felt were warranted.

■ The landowners protest the pretrial rulings that refused to allow them to present evidence of bad faith. The question of the government's bad faith is not a jury question. Rule 71A(h), Fed.R.Civ.P., provides for a trial by jury on the issue of just compensation but states that all other issues are to be decided by the court. Thus, except for the single issue of just compensation, the trial judge decides all issues presented in a condemnation proceeding. *United States v. Reynolds*, 397 U.S. 14, 19, 90 S.Ct. 803, 806, 25 L.Ed.2d 12 (1970). Further, the district court itself did not err in refusing to consider evidence of the government's alleged bad faith. The court's action was justified in light of the insubstantial and conclusory claims of the landowners. *See United States v. 416.18 Acres of Land*, 514 F.2d 627, 632 (7th Cir. 1975).

■ Finally, the landowners for the first time in this appeal object to the jury instructions. Because appellants failed to object at trial, we must review the alleged error under the plain error standard. *Ramada Development Co. v. Rauch*, 644 F.2d 1097, 1102 (5th Cir. 1981). Under this standard, we find no error in the jury instructions. The instructions were impartial and properly informed the jury that it was the judge of the facts.

Because we find no merit in any of the landowners' allegations, we affirm the judgment of the district court.

AFFIRMED.

---

In making that calculation [of the amount of just compensation], you must consider severance damages, if any. Thus, where the property condemned constitutes only a part of an owner's interest, the owner is entitled to just compensation, not only for the fair market value of the interest actually taken, but also an additional amount equal to the diminution of lowering, if any, of the fair market value of the owner's interest in the land which was not taken, due to the severance or separation of the interest which was taken. For example, severance damages may include the denial of access to a part of the remaining property. If you find that such denial exists as a matter of fact, such additional compensation is commonly known as severance damages.

Accordingly, in determining the fair market value of what remains after the taking to be deducted from the fair market value of the whole property before the taking, the difference being the measure of the defendants' just compensation, you should keep in mind that the valuation after the taking should include and reflect severance damages, if any, according to your determination from the evidence as to which damage occurred, and if so, in what amounts.