UNITED STATES of America, Plaintiff,

v.

**13.98 ACRES, MORE OR LESS, SITU-ATE IN KENT COUNTY, STATE OF DELAWARE, and Elsmere Realty Company, et al., Defendants.**

Civ. A. No. 86–600–JLL.

United States District Court,
D. Delaware.

Dec. 22, 1988.

William C. Carpenter, Jr., U.S. Atty., and Kent A. Jordan, Asst. U.S. Atty., Wilmington, Del., for plaintiff U.S.

Januar D. Bove, Jr., Jeffrey B. Bove and Edward F. Eaton of Connolly, Bove, Lodge & Hutz, Wilmington, Del., for defendants.

## MEMORANDUM OPINION

LATCHUM, Senior District Judge.

### I. INTRODUCTION

In its most elemental form, this condemnation case simply requires the Court to determine the fair market value of certain land taken by the United States of America (hereafter "United States" or "plaintiff" or "Government") pursuant to its power of eminent domain.[1] Dissection of this overall task reveals three subissues.

First, the court must ascertain the value of the subject property without regard to any encumbrances and without taking special consideration of any mineral deposits on the land. This value, which for purposes of clarity will be referred to as the "base value," is discussed in part III.A. of this opinion, *infra.*

Secondly, the Court will decide the value of an avigation easement over the property. The United States owns such an easement, having acquired and paid for it long before condemning the remainder of the property. Such condemnation of the remainder underlies the instant action. Because the United States already owns one stick (i.e. the easement) in the bundle of rights comprising the subject property, it is now taking, and should only be required to compensate the property owner for the *remaining* sticks in the bundle of rights. Hence the value of the easement—once established—will be offset against the base

1. The Federal Government's power of eminent domain is grounded upon the Fifth Amendment, which provides that no "private property [shall] be taken for public use, without just compensation." U.S. Const. amend. V. "Just compensa-tion" under the Fifth Amendment is generally synonymous with fair market value. *United States v. Miller,* 317 U.S. 369, 373–74, 63 S.Ct. 276, 279–80, 87 L.Ed. 336 (1943).

value in order to avoid duplicate payment for that particular property interest. The Court's valuation of the easement is described in part III.B. of this opinion, *infra*.

The third and final subissue which the Court must address is whether, and to what extent, the property owner's award should be enhanced to reflect allegedly valuable subsurface deposits on the property. This third subissue is resolved in part III.C. of the opinion, *infra*.

This opinion contains the Court's findings of fact and conclusions of law under Rule 52(a), Fed.R.Civ.P.

## II. BACKGROUND FACTS

Defendant Elsmere Realty Company purchased a 50–acre parcel of unimproved land located in Dover, Delaware, in 1959.[2] (Plaintiff's Exhibit ["PX"] 2 at A–1 to A–2; Docket Item ["D.I."] 28 at 8; D.I. 29 at 2.) Elsmere Realty Company is an affiliate of James Julian, Inc. ("Julian"), a large construction company operating in several states. (D.I. 28 at 1, 7–8; D.I. 29 at 2.) Throughout this opinion the terms Elsmere Realty Company, Julian, defendant, and property owner are used interchangeably.

The parcel lies to the northeast of U.S. Route 113, to the southeast of Lafferty Lane, and to the northwest of the Dover Air Force Base. (PX 2 at 5–6.) Although the 50–acre tract itself lacks road frontage, it is contiguous to other land also owned by the Julian interests which provides access to Lafferty Lane. (PX at 6.) Of the 50 acres acquired in 1959, 21.24 acres were encumbered by a pre-existing avigation easement which had been sold to the Government in the previous year.[3] (D.I. 29 at 2; PX 2 at 6, 18.) The property is otherwise unencumbered. (D.I. 22 at 2; D.I. 29 at 3.)

In 1986 the United States exercised its power of eminent domain with respect to 13.98 acres within the 50–acre tract, in furtherance of a runway expansion project at Dover Air Force Base. (D.I. 22 at 1; D.I. 28 at 8; D.I. 29 at 1–2.) The condemned acreage lies entirely within the 21.-24 acres which are subject to the avigation easement. (PX 2 at 6; D.I. 29 at 17.) The Government commenced this condemnation action on December 23, 1986, by filing a Complaint (D.I. 1) and a Declaration of Taking (D.I. 4). On that same date, the Government deposited $89,200 with this Court as estimated compensation to the property owner for the 13.98 acre taking. (D.I. 4 at 2, 6.) Julian contends that the offer is inadequate, and requests compensation in the sum of $743,700. (D.I. 28 at 2, 32, 43; D.I. 30 at 5–6.)

A nonjury trial was held before this Court on September 7 and 8, 1988, for the purpose of determining the fair market value of the subject property, and to resolve subsidiary issues.

## III. ANALYSIS

Jurisdiction in this case is predicated on the statutory authority for condemnation set forth in 40 U.S.C. §§ 257, 258a, the specific grant of jurisdiction for condemna-

---

**2.** Although the parties state that the property was acquired in 1958, the deed is dated 1959. This discrepancy is not significant.

**3.** By the terms of the avigation easement, the following rights were conferred upon the Government:

(a) The continuing perpetual right to top, to cut to ground level, to remove, and to prohibit growth of trees, bushes, shrubs, or any other perennial growth or undergrowth infringing upon, extending into, extending above, or which could in the future infringe upon, extend into, or extend above an elevation ten feet below the glide and/or transitional surfaces described.

(b) The continuing perpetual right to remove, to raze, to destroy, and to prohibit the future construction of buildings or portions thereof, other structures or portions thereof, land, embankments of earth or other materials infringing upon, extending into, or extending above the glide and/or transitional surfaces described.

(c) The right of ingress to, egress from, and passage on the lands described for the purpose of exercising the foregoing rights.

(PX 3 at 2.) Defendant has asserted that the "glide and/or transitional surfaces" referred to above range in altitude from 80 to 100 feet above the ground level of the subject property. (Transcript ["Tr."] at 92, 134; D.I. 28 at 16, 18.) The Government has not challenged this assertion. (*See* D.I. 29 at 2–3.)

tion cases in 28 U.S.C. § 1358, and the general grant of jurisdiction contained in 28 U.S.C. § 1345 for cases in which the United States is a plaintiff. Federal law governs this dispute arising out of the taking of land by the United States. *United States v. 93.970 Acres of Land,* 360 U.S. 328, 332–33, 79 S.Ct. 1193, 1195–96, 3 L.Ed. 2d 1275 (1959); *United States v. Miller,* 317 U.S. 369, 379–80, 63 S.Ct. 276, 282–83, 87 L.Ed. 336 (1943).

The Court's task is to determine the fair market value of the condemned property. The relevant point in time for this determination is the date of the taking. *United States v. Miller,* 317 U.S. 369, 374, 63 S.Ct. 276, 280, 87 L.Ed. 336 (1943). The burden of proving the value of condemned land rests upon the defendant property owner (the condemnee). *United States ex rel. Tennessee Valley Authority v. Powelson,* 319 U.S. 266, 273–74, 63 S.Ct. 1047, 1051– 52, 87 L.Ed. 1390 (1943); *United States v. 8.41 Acres of Land,* 680 F.2d 388, 394 (5th Cir.1982); *United States v. 1,629.6 Acres of Land,* 360 F.Supp. 147, 155 (D.Del.1973), *rev'd in part,* 503 F.2d 764 (3d Cir.1974).

■ Where the Government condemns only a portion of a larger tract, the proper measure of compensation is the difference between the value of the property owned by the condemnee *before* the taking as compared with the value of the property which the condemnee continues to own *after* the taking. *United States v. 47.14 Acres of Land,* 674 F.2d 722, 725 (8th Cir. 1982); *United States v. 91.90 Acres of Land,* 586 F.2d 79, 86 (8th Cir.1978), *cert. denied,* 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045 (1979). Thus in the instant case, Julian is entitled to recover the difference in value between its pre-condemnation

holdings of 50 acres and its post-condemnation holdings of 36.02 acres.[4]

#### A. *The Base Value*

The first of three subissues for the Court's determination is the so-called base value of the subject property. This term refers to the value of the condemned acreage before taking into account any encumbrances (*i.e.* the avigation easement) or any subsurface deposits (*i.e.* fill dirt). The impact of those items will be considered respectively in parts III.B. and III.C. of this opinion, *infra.*

A property's market value is computed on the basis of its highest and best use. *Olson v. United States,* 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236 (1934). In the instant case, the parties agree that the highest and best use of the subject property is for light industrial development. (PX 2 at 15; Defendant's Exhibit ["DX"] 1 at 2; D.I. 28 at 12–13, 33; D.I. 29 at 25.)

■ Although multiple methods have been devised for valuing property, comparable sales evidence is favored by the courts over alternative methods.[5] J. Gelin & D. Miller, *The Federal Law of Eminent Domain* at 286 (1982); *see, e.g., United States v. 33.5 Acres of Land,* 789 F.2d 1396, 1400 (9th Cir.1986); *United States v. 47.14 Acres of Land,* 674 F.2d 722, 726 (8th Cir.1982); *United States v. 179.26 Acres of Land,* 644 F.2d 367, 371 (10th Cir.1981). Both parties to this action have entered comparable sales data into evidence, as part of appraisal reports prepared by their expert witnesses.[6] On the basis of the comparable sales information, Julian's expert, Mr. Tingle, estimates the base value to be $15,000 per acre. (Tr. at 100, 124; DX 1; D.I. 28 at 13.) In contrast the Government's expert witness, Mr. Appel,

---

**4.** This computational nicety has little practical significance in the instant case. Neither party suggests that the per acre value of the condemned 13.98 acres is any different from the per acre value of the whole 50-acre parcel, ignoring the effect of the avigation easement. (*See* Tr. at 124; PX 2 at 17–19; D.I. 30 at 2.)

**5.** Other methods which are sometimes encountered include: (1) replacement cost less depreci-

ation, and (2) capitalization of income. (*See* PX 2 at 16; DX 1 at 2.)

**6.** Somewhat surprisingly, only a single item appears on both of the lists of comparable sales prepared by these two experienced real estate professionals. That transaction—a 1981 sale of 8.47 acres at a per acre price of $9,445—appears as item #3 on defendant's list (DX 1) and as item #1 on the Government's list (PX 2 at 25).

concludes on the basis of his own list of comparable sales that the subject property is worth only $8,500 per acre. (Tr. at 15–16; PX 2 at 18–19; D.I. 29 at 17.) For the reasons described below the Court finds, as a factual matter, that the Government's $8,500 per acre valuation is the correct one.

■ Julian's claimed $15,000 per acre base value is premised upon a list of seven comparable sales transactions compiled by Mr. Tingle. (*See* DX 1.) Item # 1 on the list is a 1987 sale of 17.9 acres for $15,950 per acre. That property, unlike the subject of the present taking, fronts on a busy highway—Route 13. (Tr. at 120–21; DX 1; D.I. 29 at 8.) Such highway frontage is an extremely valuable attribute.[7] The comparability of item # 1 and the subject parcel is at best tenuous.

■ Items # 4 and # 5 on Julian's comparable sales list are current *offerings.* (DX 1.) That is to say, no sale has yet been (and perhaps none will ever be) consummated at the indicated price.[8] Fair "market value is what a willing buyer would pay in cash to a willing seller." *United States v. Miller,* 317 U.S. 369, 374, 63 S.Ct. 276, 280, 87 L.Ed. 336 (1943). Use of a mere offering ignores one-half of the inquiry. It indicates what a seller would be willing to accept, but not what a buyer would voluntarily pay. As a practical matter, an offering price sets a *ceiling* on the value of a property, but it gives no hint as to the location of the *floor.* The Court attaches little weight to the offering prices included on Julian's list for items # 4 and # 5.[9]

■ Item # 6 on Julian's comparable sales list is the 1986 conveyance of a three-acre tract at $20,000 per acre. This tract is, by any measure, considerably smaller than the subject property.[10] Yet as both parties acknowledge, larger tracts of land command a smaller per acre price, all other things being equal. (Tr. at 99, 117; D.I. 29 at 7; D.I. 29 at 23 [noting an "inverse relationship between per-acre price for land and the size of the tract being priced"].) Thus, as Julian is forced to admit, item # 6 must be disregarded. (D.I. 28 at 13.)

■ The final transaction on the Julian list of comparable sales, item # 7, is a purported transfer of 10 acres at $15,000 per acre. The testimony at trial however, adduced the fact that this transaction is highly contingent, laden with preconditions. (Tr. at 114–16, 236; DX 4; D.I. 29 at 6.) The evidence reveals that the purchaser intended to use the property as a waste incinerator, and that its obligation to make settlement on the contract was expressly subject to the purchaser successfully securing the approval of a host of government agencies. Whether or not these contingencies were in fact satisfied is not apparent from the record. Thus item # 7 is far from a completed transaction. As a comparable sale, it suffers from the same infirmities as items # 4 and # 5, which were mere offerings.

Having concluded that Julian's reliance on items # 1, # 4, # 5, # 6, and # 7 is misplaced, its list of comparable sales is pared back to just two transactions. These two transactions—items # 2 and # 3—are final sales at $11,150 and $9,445 per acre respectively. This data hardly supports Julian's contention that the base value of the subject property is $15,000 per acre.

---

**7.** In fact an automobile dealership has since been established on the property listed as defendant's comparable sale # 1. (Tr. at 120–21.)

**8.** Both items # 4 and # 5 are listed at $10,000 per acre.

**9.** To be fair, it must be noted that the Government's listing of comparable sales similarly includes two items which are mere offerings, and not completed sales. (*See* PX 2 at 25 [items # 4 and # 5].) However in its current adversarial posture as the condemnor, there is little danger that the United States would be inclined to over-

state property values. Hence the Government's use of offering price data—which would tend to establish value at the high rather than at the low-end of the spectrum—is viewed with less skepticism than when used by the condemnee.

**10.** Regardless of whether one compares the three-acre size of item # 6 to the full parcel owned by Julian before the taking (50 acres), or to Julian's remaining parcel following the condemnation (36.02 acres), or to the actual taking itself (13.98 acres), in any case the subject property is significantly larger.

On balance, the Court finds Julian's evidence of base value to be less than persuasive, and concludes that the defendant has not sustained its burden of proving the base value of the condemned land.

■ In stark contrast, the compilation and analysis of comparable sales data by the Government's expert appears to have been thorough and well reasoned. Mr. Appel analyzed five properties. (*See* PX 2 at 17–26.) He adjusted the value of each parcel upward or downward to reflect different features of the particular parcel as compared with the subject property—such as differences in location, lot size, access to utilities, and zoning restrictions. (PX 2 at 25.) The resulting adjusted selling prices, which are estimates of the condemned property's market value, cluster rather tightly around $8,500 per acre.[11]

Based upon its analysis of the foregoing information, the Government concluded that the base value of the subject property is $8,500 per acre. (Tr. at 15–16; PX 2 at 18–19; D.I. 29 at 17.) The Court is in agreement. It finds the Government's evidence on this issue to be most convincing, and concludes that the base value of the condemned acreage is in fact $8,500 per acre.

### B. *The Avigation Easement*

■ The base value of $8,500.00 per acre includes all rights and interests in the subject property, without regard to the identity of the holder of any particular property interest. At the time of the taking, Julian owned every interest in the subject property save one: the United States has since 1958 continuously held an avigation easement over the property. Thus in fixing the

amount properly awardable to Julian, it is necessary to subtract the value of the avigation easement from the base value. The parties disagree as to the value of that easement.

The Government contends that the base value should be discounted by 25% to account for the easement. Mr. Appel's otherwise thorough appraisal report is glaringly shy on analysis of this issue. In an uncharacteristically conclusory fashion, the Appel Report states:

> [T]he acres encumbered by an existing easement have been diminished in value. This loss in value corresponds to the loss in ownership rights previously compensated for when the existing easements were put on the land. The land encumbered by the clearance easement has only lost about 25% of its bundle of rights. Therefore, its market value would be 75% of the unencumbered value (75% of $8,500.00/acre) or $6,375.00 per acre.

(PX 2 at 18.)

At trial, Mr. Appel testified that there was no substantial market data on which to rely in valuing the easement. (Tr. at 12.) He acknowledged that the 25% valuation assigned to the easement was largely the product of his professional judgment and expertise. (Tr. at 12, 48–49.) Mr. Appel cited essentially three reasons in defense of his 25% figure.

First, Mr. Appel correctly noted that the easement places some limitation on the height of buildings which could be constructed on the premises. "The easement itself, of course, ... restricts any structure that might penetrate the glide angle...." (Tr. at 12.)[12]

---

11. The market value of the subject property as indicated by each of the Government's comparable sales, is as follows:

| Comparable Sale # | Indicated Market Value of the Taking (per acre) |
|---|---|
| 1 | $8,500.00 |
| 2 | 7,959.00 |
| 3 | 8,625.00 |
| 4 | 8,400.00 |
| 5 | 8,708.00 |

(PX 2 at 25.) Attached to the end of the Government's appraisal report is a schedule captioned

"Additional Sales." This schedule contains two more transactions, both of which occurred in 1987, at prices of less than $8,500 per acre.

12. Mr. Appel testified that: "The clearance easement is known as a glide angle easement. It progresses at the ratio of fifty to one. For every one foot further out extending away from the Air Base, the angle progresses up at a 50–foot distance." (Tr. at 9.)

Mr. Appel misapprehends the contours of the easement. In fact it "slop[es] upward to the northwest at a rate of one foot vertically to each

Secondly, Mr. Appel testified that the easement constrains the fee owner's use of the property in ways more subtle than an outright cap on the height of structures.

Smoke emission could impair or adversely affect the area in the glide angle. Electrical emissions could interfere with the airplane's contact with the radio tower, and any kind of reflective nature, in glass or any product ... that adversely affected that glide angle, that would affect a pilot's ability to take off or land—those are the kind of things that [the easement would preclude.]

(Tr. at 13.) [13]

Finally the Government (through the testimony of Mr. Appel) argues that a 25% reduction in the award—attributable to the easement—is justified in part because of the difficulty an owner would experience in obtaining financing to develop the property. "A potential buyer and user of the industrial land in the clearance easement would be seeking financing most typically...." (Tr. at 14.) The Court questions whether Julian or any other owner would necessarily opt to borrow funds to finance development of the property, rather than simply applying its own resources to the task. *Cf. United States v. Leavell & Ponder, Inc.*, 286 F.2d 398, 407 (5th Cir.1961) (it was improper for the factfinder to assume that a hypothetical purchaser of con-

demned income-producing property would be in a high tax bracket).

For its part, evidence of the easement's value as submitted by Julian is only slightly more useful than that presented by the Government. Defendant raises three points with respect to the easement, and concludes that there should be no reduction in the award as a result of the easement. (Tr. at 95, 124 [testimony of Mr. Tingle]; D.I. 28 at 17–18, 33; D.I. 30 at 2.)

Julian (by way of Mr. Tingle's testimony) first observes that the Airport Industrial Park adjacent to the Greater Wilmington Airport [14] was successfully developed and marketed despite the existence of a 45 to 50 foot avigation easement over the property. (Tr. at 94–95; D.I. 28 at 17.) It then argues that "the sale price of the Airport Industrial Park real estate was not reduced because of the easement" [15] (D.I. 28 at 17), and, by implication, that the award to Julian likewise should not be discounted because of the avigation easement.[16]

Secondly, Julian emphasizes that the lowest border of the easement ranges between 80 and 100 feet above the surface of the subject property. (Tr. at 92 [testimony of Mr. Tingle]; D.I. 28 at 16, 18.) Mr. Tingle testified that a six-story building could be constructed on the site without invading the Government's airspace—particularly if the property were first excavated to a

---

fifty feet horizontally." (PX 3 at 2.) This more gradual slope conforms to the manner in which most aircraft (the Space Shuttle excluded) take off.

13. Mr. Appel's reasoning cannot be faulted. Certainly smoke, reflections, and electrical emissions could theoretically impair flight operations. Nevertheless, the Court fails to discern how such emissions are forbidden by the terms of the easement. *See supra* note 3.

14. Defendant erroneously identifies the airport as the New Castle County airport. (D.I. 28 at 17.)

15. Defendant's statement that the sale price of the Airport Industrial Park real estate was not reduced by the presence of the easement, is apparently premised upon the following exchange:

Q: Did you have any difficulty selling any of that property because there was an easement over it?
A: None whatsoever.

Q: Did you subtract anything from the value of the property in advising the owner with respect to the sale price of that property?
A: Not at all, sir.
Q: And [the easement] did not affect the sale of the property?
A: No, it did not, sir....

(Tr. at 94–95 [testimony of Mr. Tingle].) The Court notes, however, that merely because the owner of the encumbered property was able to sell it does not mean that the resultant selling price was unaffected by the presence of the encumbrance (i.e. the easement). The basis for this latter conclusion by defendant is unclear.

16. The Government maintains that the Airport Industrial Park and the subject property are in different geographical markets so as to defy comparison. (Tr. at 61 [testimony of Mr. Appel].)

depth of ten feet in accordance with Julian's plan to use the property as a source of fill dirt. (Tr. at 92.) Mr. Tingle then stated that the tallest building in the Dover vicinity (the Sheraton Hotel), is approximately six stories high. *Id.* The Court is thus invited to conclude that because a property owner would appear to have little commercial incentive to build a structure taller than the ceiling imposed by the easement, the easement has zero adverse effect on the value of the property.

Julian prefaces its third and final argument with respect to the easement by observing that the Government purchased the easement over 21.24 acres in 1958 at a cost of $850.00. (PX 3 at 1; D.I. 28 at 16.) Julian then compares this $850.00 figure to the $29,707.50 value which the Government would now assign to the easement over only 13.98 acres.[17] (D.I. 28 at 16.) The obvious suggestion by Julian is that because the original 1958 cost of the easement is so greatly exceeded by its alleged 1986 value, the latter must be grossly overstated.[18] Of course even if the Government's valuation of the easement as of 1986 is grossly *overstated,* this fact would still not dovetail with Julian's position that the easement has *no value whatsoever.*

After a careful weighing of the evidence (or lack thereof) submitted by the United States with respect to the easement, as well as that submitted by Julian on the same issue, the Court finds that the Government's 25% discount is excessive and unsupported. *Cf. Olson v. United States,* 292 U.S. 246, 257, 54 S.Ct. 704, 709, 78 L.Ed. 1236 (1934) (speculative, unsupported evidence of value is excludable in condemnation cases); *Sharp v. United States,* 191 U.S. 341, 348–49, 24 S.Ct. 114, 115, 48 L.Ed. 211 (1903) (same). At the same time, however, Julian's evidence falls short of convincing the Court that the encumbrance has absolutely no effect on the value of the subject property. Indeed the fact that the Government was forced to give some value to obtain the easement in 1958 is strong evidence to the contrary.

Thus the Court is dissatisfied with both the Government's valuation of the easement (25%) as well as Julian's valuation (0%). A court ascertains value through its exercise of reasonable judgment after considering all relevant facts. *Pete v. United States,* 531 F.2d 1018, 1030–31, 209 Ct.Cl. 270 (1976). When confronted with conflicting evidence, it may become necessary to resort to a determination in the nature of a jury verdict in order to decide valuation. *United States v. 573.88 Acres of Land,* 531 F.2d 847, 850 (7th Cir.1976) (quoting *Chandler v. United States,* 372 F.2d 276, 280 (10th Cir.1967)); *Aaron v. United States,* 340 F.2d 655, 660, 167 Ct.Cl. 818 (1964); *Branning v. United States,* 6 Cl.Ct. 618, 629 (1984). The factfinder is not "requir[ed] to accept, without adjustment in light of common sense and of other evidence in the case, one of the two competing theories of damage—lock, stock, and barrel." *Washington Metropolitan Area Transit Authority v. One Parcel of Land in Montgomery County, Maryland,* 549 F.Supp. 584, 591 (D.Md.1982), *aff'd,* 720 F.2d 673 (4th Cir.1983). *See also United States v. Tampa Bay Garden Apartments, Inc.,* 294 F.2d 598, 606 (5th Cir. 1961). In the instant case the Court con-

---

**17.** The Government's valuation of the easement is as follows:

| | |
|---|---|
| Base value per acre | $ 8,500.00 |
| Multiply by: number of acres condemned | × 13.98 |
| Value of condemned acreage, unencumbered | 118,830.00 |
| Multiply by: discount for the easement (as calculated by the Government) | × 25% |
| Value of easement over 13.98 acres (as calculated by the Government) | $ 29,707.50 |

**18.** However historical cost of property is disfavored as a determinant of current value, particularly where the original acquisition is remote in time. *United States v. Toronto, Hamilton & Buffalo Navigation Co.,* 338 U.S. 396, 403, 70 S.Ct. 217, 221, 94 L.Ed. 195 (1949). Even if historical cost were a preferred method of valuation, Julian would be hard-pressed to assert it. As described below, the Court has determined that Julian paid, at most, $16,500 for the entire 50–acre parcel in 1959. *See infra* note 23 and accompanying text. This is a far cry from the $743,700 award which Julian claims it is now due for the taking of just 13.98 of the 50 acres.

cludes, based upon its analysis of all the evidence before it (as detailed below), that the award to Julian should be reduced by 11.53% because of the preexisting avigation easement.[19]

In valuing the encumbrance, the Court notes at the outset that the United States paid $850 when it originally purchased the avigation easement on 21.24 acres in 1958. (PX 3 at 1.) Concededly the historical cost of the easement in 1958 is, standing alone, a poor indicator of its 1986 value. *See supra* note 18. Nevertheless, the easement's 1958 value is highly informative when viewed in relation to the value of the entire property at that time. In other words, it is not the *absolute dollar value* of the easement in 1958 which is relevant, but rather that value expressed as a *percentage* of value of the whole property. Thus the Court will compute the value of the easement in 1958 as a percentage of the value of the subject property's total bundle of rights at that time. It will then apply the resultant percentage to the base value of the subject property as of 1986 (unencumbered, as determined in part III.

A. of this opinion, *supra*) to arrive at the 1986 value of the avigation easement.

Given the $850 value of the easement in 1958, the next step requires establishing the value of the entire parcel at roughly the same point in time. The record does not—on its face—reveal this information. However the value of the entire property at approximately that time can be gleaned from the evidence; specifically, from the 1959 deed by which Julian acquired the full 50–acre tract.[20] That deed is included as an addendum to PX 2 (at A–1 to A–2).

While the 1959 deed recites that Julian paid "consideration of the sum of Ten ($10.00) Dollars *and other good and valuable consideration*" for the 50–acre tract, this language plainly is inconclusive. (PX 2 at A–1 [emphasis added].) Much more probative, however, is the following notation: "$18.15 U.S.I.R. STAMPS CANCELLED." *Id.* This language in the 1959 deed discloses the fact that Julian paid $18.15 in federal excise taxes on the conveyance.[21] Dividing the $18.15 tax payment by the excise tax rate of 0.11%[22] reveals that Julian paid $16,500[23] for the entire 50–acre parcel.[24]

19. The 11.53% value of the easement as determined by the Court happens to fall between the polar extremes sought by the parties (*i.e.* 25% versus 0%). Ordinarily, a factfinder's valuation of condemned property will not be disturbed on appeal where it lies within the range of evidence. *United States v. 403.14 Acres of Land,* 553 F.2d 565, 570 (8th Cir.1977); *see also United States v. 177.51 Acres of Land,* 716 F.2d 78, 82–83 (1st Cir.1983); *United States v. 6,162.78 Acres of Land,* 680 F.2d 396, 398 (5th Cir.1982).

20. The Court is compelled to assume that the value of the land and of the easement did not change materially between 1958 (when the easement was conveyed to the Government) and 1959 (when the remainder of the property was purchased by Julian). Absent evidence to the contrary, this appears to be a reasonable assumption. In any event, the parties were free to produce evidence on this point but failed to do so. In deciding this case, the Court can only operate within the confines of the evidence available to it.

21. Section 4361 of the Internal Revenue Code, as in effect in 1959, provided as follows:
There is hereby imposed, on each deed, instrument, or writing by which any lands, tenements, or other realty sold shall be granted, assigned, transferred, or otherwise conveyed to, or vested in, the purchaser or pur-

chasers, or any other person or persons, by his or their direction, when the consideration or value of the interest or property conveyed (exclusive of the value of any lien or encumbrances remaining thereon at the time of sale) exceeds $100, a tax at the rate of 55 cents for each $500 or fractional part thereof.
26 U.S.C. § 4361 (1958), *repealed by* Pub.L. 94–455, title XIX, § 1904(a)(12) (1976).

22. Section 4361 imposes a tax of 55 cents for each $500 of consideration paid for the property. $.55 ÷ $500 = 0.11%.

23. $18.15 ÷ 0.11% = $16,500. The figure of $16,500 is actually the *maximum* paid by Julian for the property in 1959. Section 4361 provides for "a tax at the rate of 55 cents for each $500 *or fractional part thereof.*" 26 U.S.C. § 4361 (emphasis added). Hence Julian could have purchased the property for any price between $16,000.01 and $16,500.00, and still incurred the same $18.15 tax. If the actual purchase price were $16,000.01 rather than $16,500, the tax rate would be 0.11343% instead of 0.11%. For purposes of the present analysis, the lack of complete precision is not deemed material.

24. Reference to the amount of revenue stamps—that is, to the size of the former federal excise tax—has been held to be reliable evidence

Of the 50 acres purchased by Julian for $16,500 in 1959, 21.24 acres were already encumbered by the avigation easement, which had been sold to the Government in the previous year. In order to value the 50–acre parcel in 1959 unencumbered by any easement, one simply needs to add back the value of the rights embodied within the easement. Thus the 1959 value of the 50 acres ($16,500) of which 21.24 acres were encumbered, plus the 1958 value of the easement over 21.24 acres ($850), equals the value of the full 50 acres in 1958/1959, unencumbered ($17,350).

With the value of the full 50–acre tract, unencumbered by any easements, calculated to be $17,350, the portion allocable to 21.24 acres would be: $17,350 × (21.24 acres ÷ 50 acres) = $7,370.28.

Having worked through the foregoing computations, the Court is now equipped with the necessary tools to determine the value of the easement as a percentage of the value of the entire property. The easement on 21.24 acres was worth $850 in 1958. This figure must then be divided by the value of 21.24 acres, unencumbered, which above was found to be $7,370.28 in 1959. The resultant ratio is 11.53%. This ratio indicates that of the total bundle of rights comprising the base value of the taking,[25] 11.53% of the value is represented by the Government's preexisting avigation easement. This portion must be subtracted from the base value. The balance of the base value (*i.e.* 88.47%) consists of those property rights owned by Julian at the time of the taking, for which an award is appropriate.

In light of the complexity of the preceding analysis, the Court will summarize the numerical calculations in a tabular format.

(1) Calculation of the excise tax rate:

| | | |
|---|---|---|
| Tax per unit | | $ .55 |
| Divide by: tax base | | $ 500.00 |
| Equals: excise tax rate | | 0.11% |

*See* 26 U.S.C. § 4361 (1958), *repealed by* Pub.L. 94–455, title XIX, § 1904(a)(12) (1976).

(2) Calculation of the value of 50 acres in 1959, unencumbered:

| | | |
|---|---|---|
| Excise tax paid by Julian on the original purchase of the entire 50 acres in 1950 (of which 21.24 acres were encumbered) (PX 2 at A–1) | | $ 18.15 |
| Divide by: | excise tax rate (as calculated in 1. above) | 0.11% |
| Equals: | cost of the 50 acres in 1959 (of which 21.24 acres were encumbered by the 1958 avigation easement) | $16,500.00 |
| Add: | cost of the easement on 21.24 acres in 1958 (PX 3 at 1) | 850.00 |
| Value of the 50 acre parcel in 1959, unencumbered by any easement | | $17,350.00 |

(3) Calculation of the value of 21.24 acres in 1959, unencumbered:

| | | |
|---|---|---|
| Value of 50 acres, unencumbered (as calculated in 2. above) | | $17,350.00 |
| Multiply by: | portion allocable to 21.24 acres (21.24 ÷ 50 = .4248) | × .4248 |
| Value of 21.24 acres in 1959, unencumbered | | $ 7,370.28 |

(4) Calculation of the value of the easement as a percentage of the value of the property, unencumbered:

| | | |
|---|---|---|
| Value of the easement on 21.24 acres in 1958 (PX 3 at 1) | | $ 850.00 |
| Divide by: | value of 21.24 acres in 1959, unencumbered (as calculated in 3. above) | 7,370.28 |
| Equals: | value of easement as a percentage of value of the property, unencumbered | 11.53% |

**C.** *The Mineral Deposits*

■ Having determined the base value of the subject property ($8,500 per acre) and the appropriate offset for the avigation easement (11.53%), the Court will now decide whether, and to what extent, Julian's award should be augmented to account for the presence of allegedly valuable subterranean deposits. The Government argues that no additional value should be attributed to the deposits. (D.I. 29 at 21.) Defendant, on the other hand, requests an enhancement of $534,000 as compensation

of the consideration received for a conveyance of realty. *United States v. 18.46 Acres of Land,* 312 F.2d 287, 289 (2d Cir.1963).

**25.** The base value of the taking was determined in part III.A. of this opinion, *supra,* to be $8,500 per acre.

for such underground deposits. (Tr. at 140; D.I. 28 at 30–31, 33; D.I. 30 at 6.)

Julian bases its argument on the notion that soil on the condemned property is particularly suitable for use as fill dirt, or "borrow," in road and bridge construction. At trial defendant unveiled its grand scheme to excavate the entire subject property to a depth of ten feet, and to sell or use the soil as fill dirt in construction projects. (DX 1; D.I. 28 at 19–20, 23–24.) Excavation to such a depth would yield approximately 15,000 cubic yards, or 22,500 tons, per acre.[26] (DX 1; D.I. 28 at 20.) Mr. Thomas Hutt, a long-time Julian employee, reported the existence of a market for borrow in Dover at the time of the taking, and testified that such a market continues to exist. (Tr. at 152; DX 1 [November 11, 1987 memorandum from Mr. Hutt]; D.I. 28 at 29.) According to Mr. Hutt, fill dirt such as that present on the subject property is worth approximately $1.70 per ton after allowing for the cost of removing the material from the ground. (Tr. at 140; DX 1; D.I. 128 at 30.) Hence the 22,500 tons of fill dirt per acre is said to have an estimated value, at $1.70 per ton, of $38,250 per acre. (DX 1; D.I. 28 at 30.) This value of $38,250 per acre, when multiplied by the size of the taking (13.98 acres), would indicate a total value for the fill dirt of $534,735. Defendant requests an increase of $534,000 in its award to reflect the alleged value of the borrow. (D.I. 28 at 30–31, 33; D.I. 30 at 6.) For the reasons stated below, the Court declines to make an upward adjustment in Julian's award because of the borrow deposits.

Defendant notes that mineral deposits are one component of fair market value.[27] *See United States v. 1,629.6 Acres of Land,* 360 F.Supp. 147, 151–53 (D.Del. 1973), *rev'd in part on other grounds,* 503 F.2d 764 (3d Cir.1974). The Court does not dispute this proposition. However the Court finds that any value in the form of mineral deposits is already reflected in the base value of the property as calculated in part III.A. of this opinion, *supra.* To hold otherwise would be to improperly sanction double counting.[28] *See United States v. 91.90 Acres of Land,* 586 F.2d 79, 87 (8th Cir.1978), *cert. denied,* 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045 (1979). Stated another way, why would the owners of comparable properties have accepted only about $8,500 per acre if in fact their properties could fetch $38,250 per acre to supply fill dirt? Such behavior would be completely illogical. The Court must conclude that the parties to the arms-length comparable sales transactions implicitly if not explicitly took into consideration any value inherent in the land as a source of borrow.

The immediately preceding analysis is based upon two findings, both of which are well founded. First is the conclusion that the parties to the comparable sales transactions were informed, rational, and acting in their own financial self-interest. This of course is a fundamental proposition of any comparable sale transaction. If it were not true in a particular situation, then such conveyance could not be a comparable sale. The purpose of using comparable sales data is to estimate fair market value. By definition, "fair market value is the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy or sell, and both being reasonably informed as to all rele-

---

**26.** It is undisputed that one cubic yard of borrow weighs about 1.5 tons. (Tr. at 267; DX 1 [November 25, 1987 memorandum from Mr. Hutt]; D.I. 28 at 20, 30; D.I. 29 at 13.) Thus 15,000 cubic yards weighs 22,500 tons.

**27.** D.I. 28 at 36.

**28.** It bears repeating that use of comparable sales information is the preferred method for computing fair market value. *See, e.g., United States v. 33.5 Acres of Land,* 789 F.2d 1396, 1400 (9th Cir.1986); *United States v. 47.14 Acres of*

*Land,* 674 F.2d 722, 726 (8th Cir.1982); *United States v. 179.26 Acres of Land,* 644 F.2d 367, 371 (10th Cir.1981). Other valuation methods, such as the capitalization of income approach which lies at the root of Julian's borrow analysis, is justified mainly where better evidence is not available. *United States v. 47.14 Acres of Land,* 674 F.2d at 726; *United States v. 179.26 Acres of Land,* 644 F.2d at 371–72. In the instant case, however, comparable sales data is already in evidence and has been studied by the Court. There is no need to look further.

vant facts." *Miller v. United States,* 620 F.2d 812, 825, 223 Ct.Cl. 352 (1980) (quoting *Jack Daniel Distillery v. United States,* 379 F.2d 569, 574, 180 Ct.Cl. 308 (1967)). In using the Government's list of comparable sales (*see* part III.A. of this opinion, *supra* ), the Government's expert and the Court necessarily concluded that the parties to those comparable sales transactions were well informed and behaved rationally. (*See* PX 2 at 1.)

 The Court's holding that Julian is entitled to no enhancement for the value of the borrow also relies upon a second premise. The Court concludes that the earth beneath Julian's land is not unique.[29] The land conveyed via the comparable sales transactions contains soil similar to that of the subject property. A special award to Julian therefore is unwarranted.

Evidence supports the Court's finding that the soil beneath the subject property lacks uniqueness. (*See* Tr. at 240–43, 274–75; D.I. 29 at 19, 24.) Though artfully described as "select borrow," defendant really refers to dirt which is not radically different from that found on many nearby properties.[30] "The [subject] property is located in an area of sandy/silty ground known as the Calvert Formation. The Formation extends approximately one (1) mile north, 4.5 miles east and an indeterminate distance west and south...." (PX 4 at 1 [referring to a U.S. Geological Survey Map attached as an addendum thereto].) This is not a case of gold or oil or some other valuable commodity being present on the subject property, but not on neighboring lands, so as to render comparable sales analysis meaningless.

If select borrow were indeed as valuable as defendant would lead this Court to believe, then defendant would be well advised to use its award to procure comparable land for approximately $8,500 per acre. Julian could then develop the land or use it as a source of fill dirt (or both), as it sees fit, and reap all of the resultant profits.

In addition to its desire to avoid double counting, there are other reasons why the Court will award no additional compensation for the borrow. First the Court notes that Julian owned the subject property for 27 years, from its acquisition in 1959 until its taking by eminent domain in 1986. Yet during this entire period Julian never took the initiative to extract and sell the supposedly valuable fill dirt. (Tr. at 184, 191, 216–17; D.I. 28 at 9; D.I. 29 at 3.) Even if, as Julian states, it is capable of removing all of the borrow within a two to three month span (*see* Tr. at 280; D.I. 28 at 5, 24), there is still no indication of when, if ever, such removal would have taken place. An award of compensation must be founded upon more than speculation. *Olson v. United States,* 292 U.S. 246, 257, 54 S.Ct. 704, 709, 78 L.Ed. 1236 (1934); *Sharp v. United States,* 191 U.S. 341, 348–49, 24 S.Ct. 114, 115, 48 L.Ed. 211 (1903).

In determining fair market value, the relevant point in time is the date of the taking. *United States v. Miller,* 317 U.S. 369, 374, 63 S.Ct. 276, 280, 87 L.Ed. 336 (1943). If the fill dirt would not have been utilized until well into the future, it would be necessary to discount the corresponding income stream back to present value in order to properly account for the time value of money. To use an example, the present value of $1 to be received in 27 years (when discounted at an 8% rate, compounded annually) is 12½ cents. More to the point, the present value of $534,000 if received 27 years hence (discounted at 8% annually) is only $66,750.[31]

Temporal uncertainties notwithstanding, there is also serious doubt as to whether

---

29. In this regard the case is distinguishable from *United States v. 1,629.6 Acres of Land,* 360 F.Supp. 147 (D.Del.1973), *rev'd in part,* 503 F.2d 764 (3d Cir.1974), upon which defendant relies. There, unlike in this case, the factfinder determined that the condemned property's utility as a sand and gravel pit was unique.

30. The Court does not mean to suggest that all dirt is alike. (*See* PX 7 [excerpt from *Delaware Standard Specifications 1985* at 79].) For instance, soil containing biodegradable matter is less suitable as fill dirt. As the matter decays, the structure which it supports would be undermined.

31. The $534,000 used in this example obviously represents the value of the fill dirt as per Julian. Twenty-seven years is the length of time Julian held the property in the *past* without removing the fill dirt. Although for purposes of calculating present value the relevant inquiry is when,

defendant would have been permitted by the local authorities to tap its borrow deposits. At trial the Court heard the testimony of Mr. Jack T. Roe. (Tr. at 62–88.) Mr. Roe is the Director of Inspections and Planning for the City of Dover, the official primarily responsible for interpreting and applying the City's zoning code. (Tr. at 64.) Mr. Roe testified that in his opinion, Julian's contemplated removal of fill dirt to a depth of ten feet would violate Dover Code, Article 3, Section 20.27. (Tr. at 68; PX 5; D.I. 29 at 18.) For property with an IPM (Industrial Park Manufacturing) zoning classification such as the subject property, § 20.27 specifically prohibits "[q]uarries, stone crushers, screening plants, and storage of quarry screenings, accessory to such uses." (DX 5.) Mr. Roe opined that Julian's planned borrow pit operations fall within the purview of § 20.27, and would be prohibited. (Tr. at 68–69; PX 5; D.I. 29 at 18–19.)

Thus the Court questions whether, as a factual matter, defendant would have been permitted by the City of Dover to extract underground borrow deposits.[32] This uncertainty suggests that any value inherent in the borrow was all the more speculative at the time of the taking.

There is yet another reason why the Court will not award the compensation sought by Julian for the fill dirt. According to Julian's vision of the subject property, soil would be skimmed off the surface to a depth of ten feet. (Tr. at 201; D.I. 28 at 19–20.) Only upon completion of the borrow excavation would the property then be developed for industrial use. (D.I. 28 at 31; D.I. 30 at 3.) Defendant makes no downward adjustment in the property's base value for development purposes as a result of the removal of ten feet of topsoil.

(Tr. at 100–101; D.I. 28 at 2, 14.) The Court believes that the failure to make such a reduction in base value ignores reality. The removal of borrow would appear to depress the land's value for development purposes just as surely as it would physically depress its surface level. Aside from obvious aesthetic considerations, excavation to a depth of ten feet would bring the land's surface level to within two feet of the water table. (Tr. at 269; PX 4 at 4; D.I. 28 at 19.) This, in turn, would make construction more difficult and costly, thereby impairing the base value of the property to some extent.

Lastly, the Court observes that Julian's own evidence of value for the borrow is contradictory. At trial, defendant sought to prove the net value of borrow to be $1.70 per ton after deducting removal costs. (Tr. at 140; DX 1; D.I. 28 at 30.) At a time much closer to the date of the taking, however, Julian's response to an interrogatory indicated its belief that borrow was worth only $.50 per cubic yard, or roughly $.33 per ton.[33] (D.I. 16 [answer # 7].)

For all of these reasons, the Court cannot award Julian any additional compensation for its borrow deposits. Such an award would constitute a double counting of the amount already determined as the base value, which was computed using comparable sales data. Furthermore, the amounts sought are too speculative. Julian has fallen far short of carrying its burden of proof on the borrow issue.

## IV. SUMMARY

The Court determined, in part III.A. of this opinion, *supra,* that the subject property's base value was $8,500 per acre. Over the full 13.98 acre area of the taking, the base value therefore is $118,830.

---

in the *future,* the income would be realized, 27 years appears to be as good an estimate as any. Eight percent is a reasonable, though somewhat arbitrary, discount rate.

**32.** The Court need not and does not decide whether Mr. Roe's construction of the Dover Code is correct as a matter of law.

**33.** Defendant did qualify its response to the interrogatory by stating: (1) that its computed

damages figure was a *minimum,* and (2) that it had not yet received an expert appraisal. (D.I. 16 [answer # 7].) Despite its disclaimers, defendant has repeatedly emphasized its expertise in the construction business and its vast experience in working with borrow. (*See* D.I. 28 at 4–5, 7–10, 22–23, 25, 31.) Such a wide disparity in Julian's evidence as to the value of borrow therefore is somewhat curious.

In part III.B. *supra*, the Court concluded that the base value should be decreased by 11.53% to reflect the value of an avigation easement which the United States already owned, and therefore has not taken in the present condemnation proceedings. Reducing $118,830 by 11.53% ($13,701) leaves $105,129.

The Court further held in part III.C. *supra*, that no incremental value allocable to subsurface deposits would be awarded. Hence Elsmere Realty Company was entitled to an award of $105,129 as of the date of the taking—December 23, 1986. On that date the Government deposited $89,200 into Court, leaving a deficiency of $15,929.

Records of the Clerk of the Court indicate that the $89,200 deposited with the Court was placed in an interest-bearing account. Although the defendant has been at liberty to petition the Court for a distribution of the $89,200 sum,[34] as yet it has not done so. The Court shall issue an order for the payment to defendant of the $89,200, along with interest accrued thereon, if and when defendant so moves.

As for the $15,929 deficiency, the Court will enter judgment against the United States for this amount, coupled with interest of $2,135 [35] computed from the date of the taking in accordance with 40 U.S.C. § 258e–1, for a total of $18,064.

---

**34.** *See* 40 U.S.C. § 258a ("[u]pon the application of the parties in interest, the court may order that the money deposited in the court, or any part thereof, be paid forthwith for or on account of the just compensation to be awarded in said proceeding"); Rule 71A(j), Fed.R.Civ.P. ("the court and attorneys shall expedite the proceedings for the distribution of the money so deposited").

**35.** Interest from 12/23/86 to 12/22/87:

| | | |
|---|---|---|
| Initial deficiency | $15,929 | |
| Multiply by: interest rate | × 5.77% | $ 919 |

Interest from 12/23/87 to 12/22/88:

| | | |
|---|---|---|
| Deficiency, increased by compounded interest ($15,929 + $919) | $16,848 | |
| Multiply by: interest rate | × 7.22% | $1,216 |
| Total interest on the deficiency, from date of taking to date of judgment | | $2,135 |

Interest rates are the coupon issue yield equivalents of the average accepted auction price for *the last auction of 52–week United States Treasury bills settled immediately before the start of the relevant time period. See 40 U.S.C. § 258e–1. This data is supplied by the Director of the Administrative Office of the United States Courts. Id.*